**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 1 2001**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CHARLES C. CURRIER, as personal
representative of the Estate of Anthony
Michael Juarez, deceased; DEVONNE
ESPERANZA JUAREZ, as mother and
next friend of Latasha Juarez, a minor,

      Plaintiffs-Appellees,

v.

TOM DORAN, SHIRLEY MEDINA,
MELBA GONZALES, REGINA
SENTELL, in their personal capacity,

      Defendants-Appellants,

and

KELLY ROBBINS, in her personal
capacity,

      Defendant.

No. 99-2287
No. 99-2288

---

Appeal from the United States District Court
for the District of New Mexico
(D.C. No. CIV-97-477-BB/JHG)

Paula I. Forney, of Legal Bureau-Risk Management, Santa Fe, New Mexico, for Appellant Gonzales.

Timothy Flynn-O'Brien, Albuquerque, New Mexico, for Appellants Doran, Medina and Sentell.

Charles K. Purcell, of Rodey, Dickason, Sloan, Akin & Robb, P.A., Albuquerque, New Mexico, (William S. Dixon of Rodey, Dickason, Sloan, Akin & Robb, P.A., and Michael L. Stout, of Roswell, New Mexico, with him on the briefs) for Plaintiffs-Appellees.

---

Before **SEYMOUR,** and **MURPHY,** Circuit Judges, and **KANE,**[*] District Judge.

---

**MURPHY**, Circuit Judge.

---

## I. INTRODUCTION

Plaintiffs, the representatives of two minor children abused by their father, brought suit pursuant to 42 U.S.C. § 1983 alleging Defendants violated their fundamental rights under the Fourteenth Amendment of the United States Constitution. Defendants Tom Doran, Shirley Medina, and Regina Sentell are social workers for the Children, Youth and Families Department of the State of New Mexico ("CYF"), and defendant Melba Gonzales is a supervisor for CYF.[1]

---

[*]Honorable John L. Kane, Jr., Senior District Judge, United States District Court for the District of Colorado, sitting by designation.

[1]CYF was formerly known as the Human Services Department of the State of New Mexico.

Defendants moved for summary judgment, arguing they were entitled to qualified immunity. The district court treated the motions as motions to dismiss. Defendants appeal the district court's denial of their motions. Jurisdiction to consider Defendants' appeal arises under 28 U.S.C. § 1291. *See Johnson v. Fankell*, 520 U.S. 911, 915 (1997) ("[A] Federal District Court order rejecting a qualified immunity defense on the ground that the defendant's actions—if proved—would have violated clearly established law may be appealed immediately as a 'final decision' within the meaning of the general federal appellate jurisdiction statute."). Because Plaintiffs have alleged a clearly established constitutional claim against Defendants Doran and Gonzales, these Defendants are not entitled to qualified immunity; this court therefore **affirms** the district court's denial of their motions for summary judgment. Because Plaintiffs have not alleged a viable constitutional claim against Defendant Sentell, this court **reverses** the district court's denial of her motion for summary judgment. Because the constitutional violation Plaintiffs state against Medina was not clearly established at the time of the events underlying this suit, this court **reverses** the district court's denial of Medina's motion for summary judgment.

## II. FACTS AND PROCEDURAL HISTORY

Plaintiffs allege the following facts in their complaint and in their response to Defendants' motions for summary judgment. On April 30, 1993, Defendant Medina visited the home of Devonne Juarez ("Juarez") to investigate a report of child neglect. Juarez is the natural mother of Latasha and Anthony Juarez, whose abuse prompted this lawsuit.[2] Medina found Latasha and Anthony, who were both under four years old, in the care of their five-year-old cousin. Medina discovered that Juarez had left the state. Medina removed Latasha and Anthony from the home and delivered the children into the physical custody of CYF.

On May 3, 1993, CYF petitioned the New Mexico Children's Court ("Children's Court") for an order formally granting legal custody of the children to CYF. Medina stated in an affidavit supporting the petition that Christopher Vargas, the father of Latasha and Anthony, had not supported the children and had allowed them to live in "alarming conditions." Medina had also been informed by an associate of Vargas that Vargas worked evenings and would "have a hard time taking care of the kids."

During this time Defendant Doran became aware of Vargas' history of financial irresponsibility, which included having made only eight child-support payments in the preceding three years. On May 10, 1993, the Children's Court

_____

[2]Charles C. Currier is suing as personal representative of Anthony's Estate, and Juarez represents Latasha, a minor, as mother and next friend.

held a custody hearing. Doran attended but said nothing about Vargas' history of child-support payments. The Children's Court stated that "no parent, guardian, custodian or other person is able or willing to provide adequate supervision and care for the children." Nevertheless, based on the recommendation of Medina, the court granted physical custody of the children to Vargas while keeping legal custody with CYF.

At some point during the following months, Vargas was also awarded legal custody. Plaintiffs contend this occurred on October 19, 1993, and that Doran, either through his failure to investigate and report to the Children's Court or his affirmative recommendation to the Children's Court, was responsible for this decision. Defendants maintain Vargas assumed legal custody on June 23, 1993. The district court allowed limited discovery on this issue, but found it unnecessary to resolve the issue in denying Defendants' motions.

On July 22, 1993, Doran visited Latasha and Anthony at Vargas' home. Doran noticed a small bruise on Anthony's cheek; Vargas' girlfriend claimed the bruise was the result of a fall on the playground. On August 3, 1993, Anthony had another bruise when he arrived at the CYF office for a visit. This bruise was also attributed to a fall. Doran did not further investigate either bruise.

Juarez returned to New Mexico in August 1993. On August 25 and September 16, 1993, Juarez asserted to the children's guardian ad litem that

Vargas and his fiancee were physically abusing Latasha and Anthony. Defendant Doran was told about at least one of these allegations but failed to investigate. On August 31, 1993, during the course of a comprehensive psychological evaluation conducted at CYF's request, Juarez alleged that Vargas' fiancee punished Latasha and Anthony by dunking them in a bathtub full of water. Doran learned of these accusations but failed to investigate.

On October 15, 1993, during a visit between Juarez and the children at the CYF office, two bruises were noticed on Latasha's back. When Latasha was asked who gave her the bruises, she replied "Da, Da." On October 20, 1993, the guardian ad litem for Latasha and Anthony sent letters to Doran and Gonzales urging a thorough investigation of the recent observations of bruises on Latasha's back. Doran did interview Vargas and his fiancee about the bruises; they explained that the bruises had been caused by a bunk bed ladder which they had since thrown away.

On November 17, 1993, bruises were noticed on Anthony's face while he was in the CYF office. Vargas' fiancee claimed the bruises were the result of Anthony's fall from a bunk bed. CYF then removed Latasha and Anthony from Vargas' home and placed them with relatives. When questioned about the bruises on Anthony's cheek, Vargas explained to Doran that he had bitten Anthony on the cheek while wrestling on the floor, but that he did not think he had bitten

Anthony "that hard." Latasha made some remarks indicating that "Ta Ta" had bitten Anthony to punish him. There were also bite marks on Latasha that Vargas could not explain. Doran prepared an affidavit for a November 19, 1993 meeting with Gonzales in which he indicated that the children would be subject to further abuse if permitted to stay with Vargas. In the meeting, however, Doran failed to strongly advocate against return of the children to Vargas. Gonzales concluded the children had to be returned to Vargas, which occurred on November 19, 1993.

On January 10, 1994, a request for an investigation of possible physical abuse of Anthony was made to Defendant Sentell. Sentell received this request and referred it to Medina for further action. Medina discovered bruises on Anthony's buttocks but concluded the bruises were the result of a fall. During the visit Latasha told Medina that she was spanked with a belt.

On January 16, 1994, the children's guardian ad litem filed a report indicating that "Anthony and Latasha will be subject to further injury in their current home situation" and recommended monitoring the situation. Despite this recommendation, Medina and Doran then instructed Juarez to stop making allegations of abuse because it was traumatizing the children. On March 16, 1994, Doran referred another allegation of abuse to Sentell. Sentell discovered bruises on both Latasha and Anthony but concluded the injuries were not the result of abuse.

On April 16, 1994, Vargas poured boiling water on Anthony, causing Anthony severe burns over most of his body. When Doran learned of this incident, he went to Vargas' home, where he observed many indications of violence. Doran removed Latasha, who was covered with bruises, from Vargas' home and took her to the emergency room. Doctors at the emergency room indicated that Anthony was bruised everywhere he was not burned. Defendants then sought and gained custody of the children on CYF's behalf. Anthony died in an intensive care unit on May 3, 1994.

Plaintiffs filed this lawsuit in the United States District Court for the District of New Mexico, claiming Defendants had violated Latasha and Anthony's rights under the Fourteenth Amendment. After the completion of the limited discovery referred to above, Medina and Doran moved for summary judgment on the grounds that *DeShaney v. Winnebago County Department of Social Services* precluded Plaintiffs' claims. 489 U.S. 189 (1989). Defendant Gonzales independently moved for summary judgment, raising the same argument. Gonzales also maintained, however, that even if *DeShaney* did not foreclose Plaintiffs' claims, the law was not clearly established at the time of the underlying events and thus she was entitled to qualified immunity. The district court issued a memorandum opinion and order stating that *DeShaney* did not foreclose Plaintiffs' claims but concluding the law was not clearly established at the time of

the events underlying this suit. *See Currier v. Doran*, 23 F. Supp. 2d 1277, 1279-83 (D.N.M. 1998) Thus, the district court denied Medina and Doran's motion and granted Gonzales' motion. *See id.* at 1283.

The district court subsequently issued an order withdrawing the portion of its memorandum opinion dealing with the issue of whether the law was clearly established during the events underlying the suit, apparently because counsel for Gonzales had raised the issue in her brief to the court but failed to do so in her brief to Plaintiffs' counsel. *See Currier v. Doran*, No. CIV 97-0477 BB/JHG, slip op. at 1-2 (D.N.M. Aug. 19, 1999). Doran, Medina, and Sentell then joined Gonzales in moving for summary judgment based on qualified immunity.

The district court again held that *DeShaney* did not preclude Plaintiffs' claims. *See id.* at 6-10. The district court also concluded that at the time of the events underlying the suit it was clearly established Defendants' alleged conduct could be the source of a constitutional violation, reversing its prior memorandum opinion. *See id.* at 2-6. Thus, the district court denied Defendants' motions for summary judgment. *See id.* at 10.

## III. DISCUSSION

### A. Standard of Review

-9-

Although Defendants' motions were filed as motions for summary judgment, the district court treated them as motions to dismiss because discovery had been limited to the question of when legal custody was given to Vargas. Thus, all the allegations in Plaintiffs' complaint were accepted as true. *See Williams v. Meese*, 926 F.2d 994, 997 (10th Cir. 1991). The district court also relied on additional facts disclosed in the limited discovery and alleged by Plaintiffs in their response to Defendants' motions for summary judgment.

Defendants argue that because matters outside the pleadings were considered it was error for the district court to apply a motion to dismiss standard rather than a summary judgment standard. Defendants' argument, however, would have left the district court with the option of either referring solely to the complaint or determining whether the minimal evidence then available warranted a trial. Plaintiffs could not properly respond to a factual challenge to their complaint because the district court had allowed discovery only on the limited question of when legal custody was granted to Vargas. In addition, it would have been odd to prohibit Plaintiffs from relying on additional facts disclosed during that discovery. As Plaintiffs correctly note, they could have amended their complaint to include the new information as factual allegations. Thus, the district court properly treated Defendants' motions as motions to dismiss. *See* Fed. R. Civ. P. 56(f) (stating that when the nonmovant cannot respond to a summary

judgment motion the court "may order a continuance to permit . . . discovery to be had or *may make such other order as is just*" (emphasis added)).

Whether Plaintiffs have stated a claim for which relief may be granted is a question of law this court reviews *de novo*. *See Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d. 1226, 1236 (10th Cir. 1999). Similarly, whether the law on which Plaintiffs rely was clearly established at the time of the events underlying this suit is also a question of law subject to *de novo* review. *See Armijo v. Wagon Mound Pub. Sch.*, 159 F.3d 1253, 1260 (10th Cir. 1998). All of Plaintiffs' allegations are accepted as true. *See Williams*, 926 F.2d at 997.

## B. Heightened Pleading Requirement

Defendants correctly note that this court requires plaintiffs to meet a heightened pleading requirement once a defendant raises the defense of qualified immunity. *See, e.g.*, *Breidenbach v. Bolish*, 126 F.3d 1288, 1292 (10th Cir. 1997); *Sawyer v. County of Creek*, 908 F.2d 663, 667 (10th Cir. 1990). The heightened pleading standard requires plaintiffs to "do more than assert bare allegations of a constitutional violation." *Breidenbach*, 126 F.3d at 1293. The plaintiff's complaint must include "'all of the factual allegations necessary to sustain a conclusion that defendant violated clearly established law.'" *Id.* (quoting *Dominque v. Telb*, 831 F.2d 673, 676 (6th Cir. 1987)). The factual allegations must be "specific" and "non-conclusory," and sufficient for a district court to

determine that those facts, if proved, demonstrate the defendant is not entitled to qualified immunity. *Id.* The heightened pleading requirement is an exception to the notice pleading standard in Rule 8 of the Federal Rules of Civil Procedure and "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

Plaintiffs question whether this court's heightened pleading requirement survives the recent Supreme Court case of *Crawford-El v. Britton*, 118 S. Ct. 1584 (1998). Although we are generally bound by the prior precedent of this court, there is an exception to this rule when that precedent is superceded by contrary decisions of the Supreme Court. *See United States v. Bell*, 154 F.3d 1205, 1209 n.6 (10th Cir. 1998); *United States v. Erving L.*, 147 F.3d 1240, 1246 (10th Cir. 1998). This court has recognized on several occasions the possibility that *Crawford-El* might affect this court's heightened pleading requirement, but has yet to resolve that question in a published, precedential opinion. *See Ramirez v. Dep't of Corr.*, 222 F.3d 1238, 1241 n.2 (10th Cir. 2000); *see also Smith v. Dep't of Human Servs.*, No. 00-6046, 2000 WL 1480259, at *2 n.2 (10th Cir. Oct. 6, 2000) (unpublished disposition); *Watkins v. Colo. Dep't of Corr.*, No. 98-1063, 1999 WL 594584, at *1 (10th Cir. Aug. 9, 1999) (unpublished disposition). *See*

*generally* Patricia M. Wald, *Summary Judgment at Sixty*, 76 Tex. L. Rev. 1897, 1925 & n.187 (suggesting that *Crawford-El* puts an end to judicially-crafted heightened pleading requirements in qualified immunity cases). Because application of the heightened pleading requirement affects the outcome of this case, this court must consider its continued viability after *Crawford-El*.

The heightened pleading requirement is premised on "the purpose of the qualified immunity doctrine itself." *Breidenbach*, 126 F.3d at 1292. More specifically, this court has linked the heightened pleading requirement to the Supreme Court case of *Harlow v. Fitzgerald*, 457 U.S. 800 (1982):

> When the Supreme Court reformulated its qualified immunity test in *Harlow* to focus on the "objective reasonableness" of an officer's actions as opposed to his or her subjective intent, the Court sought to shield government officials not only from the "substantial costs" of subjecting officials to the risks of trial, but also from "[j]udicial inquiry into subjective motivation," including "broad-ranging discovery and the deposing of numerous persons." The Court held that such inquiries "can be peculiarly disruptive of effective government." In keeping with this important concern for shielding government officers from burdensome discovery in cases where subjective intent is at issue, this court and several other circuits have imposed a more stringent pleading requirement where a qualified immunity defense is asserted.

*Breidenbach*, 126 F.3d at 1292 (citations omitted).

In *Harlow* the Supreme Court reconsidered qualified immunity law as it existed at the time. Before *Harlow* a plaintiff could defeat a government official's defense of qualified immunity two ways: by demonstrating the official

knew or should have known her action was unconstitutional (referred to by the Court as the "objective element" of qualified immunity) or by demonstrating the official acted with the malicious intent to cause injury (the "intent element" of qualified immunity[3]). *See Harlow*, 457 U.S. at 815. In *Harlow*, however, the Court decided the intent element of qualified immunity had proved in practice to be incompatible with the overall goal of qualified immunity, which is to prevent government officials from being disrupted by a trial of insubstantial claims. *See id.* at 815-17. The Court explained that because the question of an official's intent to cause harm could not usually be disposed of at summary judgment, many plaintiffs were proceeding to trial against government officials on insubstantial claims because the plaintiffs were able to easily create an issue of fact on whether the government official had the subjective intent to harm them. *See id.* at 815-18. The Court eliminated the intent element of qualified immunity, reasoning that "bare allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery." *Id.* at 817-18.[4]

---

[3]The Supreme Court in *Harlow* actually referred to the latter option as the "subjective element," but for clarity this opinion will instead refer to this option as the "intent element." *See Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982).

[4]Intent, however, remains an element of a plaintiff's affirmative case in some instances. In *Harlow*, the Court dealt only with the defense of qualified immunity. Many constitutional claims brought pursuant to 42 U.S.C. § 1983, however, require proof that the government official acted with a prohibited

Thus, after *Harlow*, a plaintiff can defeat a defendant's claim of qualified immunity only by demonstrating the defendant violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818. After *Harlow*, many circuits imposed upon plaintiffs a heightened pleading requirement, similar to this court's, once qualified immunity was raised as a defense. *See, e.g., Branch v. Tunnell*, 14 F.3d 449, 452 (9th Cir. 1994); *Gooden v. Howard County*, 954 F.2d 960, 969-70 (4th Cir. 1992); *Elliott v. Thomas*, 937 F.2d 338, 344-45 (7th Cir. 1991).

In *Crawford-El* the Supreme Court examined the D.C. Circuit Court of Appeal's heightened burden of proof. The D.C. Circuit's heightened-proof standard applied when a plaintiff sued a government official, the government official asserted the defense of qualified immunity, and the plaintiff's cause of action depended on proving improper motive of the defendant. *See Crawford-El*, 118 S. Ct. at 1588-91. The D.C. Circuit's heightened burden of proof, applicable at both summary judgment and trial, required plaintiffs to prove by clear and convincing evidence defendant's improper motive. *See id.* at 1590. Justice Stevens, writing for a majority of the Court, expansively framed the issue before the Court in *Crawford-El* as follows:

---

mindset, and *Harlow* does not alter what plaintiffs' are required to prove on these claims. *See Crawford-El*, 118 S.Ct. at 1592.

-15-

> The broad question presented is whether the courts of appeals may craft special procedural rules for [improper-motive] cases to protect public servants from the burdens of trial and discovery that may impair the performance of their official duties. The more specific question is whether, at least in cases brought by prisoners, the plaintiff must adduce clear and convincing evidence of improper motive in order to defeat a motion for summary judgment.

*Id.* at 1587.

Ultimately, the Supreme Court rejected the D.C. Circuit's heightened burden of proof. *See id.* at 1596. The D.C. Circuit had justified its heightened burden of proof requirement, like this court justifies its heightened pleading requirement, on the Supreme Court's opinion in *Harlow*. *See id.* at 1590. The Court explained, however, that neither the specific holding in *Harlow* nor its reasoning justified the D.C. Circuit's heightened burden of proof. *See id.* at 1591-96.

The Court carefully distinguished *Harlow* as a case dealing only with the defense of qualified immunity: *Harlow* "did not implicate the elements of the plaintiff's initial burden of proving a constitutional violation" nor "address any question concerning the plaintiff's affirmative case." *Id.* at 1592, 1591. The Court explained that although the decision in *Harlow* was motivated by a concern that public officials be protected from the costs associated with defending against lawsuits, particularly baseless ones, it did not follow that a defendant's claim of qualified immunity could always be resolved before at least some discovery was

conducted.  *See id.* at 1593-94 & 1594 n.14.  In addition, the Court commented that a heightened proof standard "alters the cause of action itself in a way that undermines the very purpose of § 1983—to provide a remedy for the violation of federal rights."  *Id.* at 1595.

The Court in *Crawford-El* also observed that neither federal statutory law nor the Federal Rules of Civil Procedure gave any support to the heightened burden of proof.  *See id.* at 1595.   In language particularly relevant to this court's heightened pleading requirement, the Supreme Court stated the following:

> In the past we have consistently declined similar invitations to revise established rules that are separate from the qualified immunity defense.   We refused to change the Federal Rules governing pleading by requiring the plaintiff to anticipate the immunity defense, *Gomez*, 446 U.S., at 639-640, or requiring pleadings of heightened specificity in cases alleging municipal liability, *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 164-169 (1993).   We also declined to craft an exception to settled rules of interlocutory appellate jurisdiction and rejected the argument that the policies behind the immunity defense justify interlocutory appeals on questions of evidentiary sufficiency. *Johnson v. Jones*, 515 U.S. 304, 317- 318 (1995).   Our reasons for those unanimous rulings apply with equal force to the imposition of a clear and convincing burden of proof in cases alleging unconstitutional motive.
>
> As we have noted, the Court of Appeals adopted a heightened proof standard in large part to reduce the availability of discovery in actions that require proof of motive.  To the extent that the court was concerned with this procedural issue, our cases demonstrate that questions regarding pleading, discovery, and summary judgment are most frequently and most effectively resolved either by the rulemaking process or the legislative process.   See, *e.g., Leatherman*, 507 U.S., at 168-169.

*Crawford-El*, 118 S. Ct. at 1595 (duplicate citations omitted).

The Seventh Circuit has recently cited *Crawford-El* for the proposition that "[c]ivil rights complaints are not held to a higher standard than complaints in other civil litigation." *Nance v. Vieregge*, 147 F.3d 589, 590 (7th Cir. 1998). *But see Elliott*, 937 F.2d at 344-45 (explaining, prior to issuance of *Crawford-El*, the Seventh Circuit's heightened pleading requirement). Similarly, the D.C. Circuit, the very court from which Crawford-El appealed to the Supreme Court, has recently stated that the Supreme Court "held [in *Crawford-El*] that plaintiffs making constitutional claims based on improper motive need not meet any special heightened pleading standard." *See Harbury v. Deutch*, 233 F.3d 596, 611 (D.C. Cir. 2000). The First Circuit, however, has concluded that *Crawford-El* does not affect its heightened pleading requirement. *See Judge v. City of Lowell*, 160 F.3d

67, 72-75 (1st Cir. 1998).[5]  In upholding their heightened pleading requirement,

the First Circuit relied on the following language from *Crawford-El*:

> In *Harlow* we noted that a "'firm application of the Federal
> Rules of Civil Procedure' is fully warranted" and may lead to the
> prompt disposition of insubstantial claims.  457 U.S., at 819-820, n.
> 35 (quoting *Butz*, 438 U.S., at 508).  Though we have rejected the
> Court of Appeals' solution, we are aware of the potential problem
> that troubled the court.   It is therefore appropriate to add a few
> words on some of the existing procedures available to federal trial
> judges in handling claims that involve examination of an official's
> state of mind.
>        When a plaintiff files a complaint against a public official
> alleging a claim that requires proof of wrongful motive, the trial
> court must exercise its discretion in a way that protects the substance
> of the qualified immunity defense.  It must exercise its discretion so
> that officials are not subjected to unnecessary and burdensome
> discovery or trial proceedings.   The district judge has two primary
> options prior to permitting any discovery at all.  First, the court may

---

[5]Although various Sixth Circuit cases have touched upon *Crawford-El*'s
impact on its heightened pleading requirement, it does not appear a firm
resolution has been reached.  *See Thaddeus-X v. Blatter*, 175 F.3d 378, 399 (6th
Cir. 1999) (en banc) (plurality opinion) (stating, in the resolution of a motion for
summary judgment, that "*Crawford-El* disallows any type of 'heightened pleading
standard' to avoid" analyzing the subjective motivation of the defendant); *Kain v.
Nesbitt*, 156 F.3d 669, 672 n.4, 673 (6th Cir. 1998) (first distinguishing between
burdens of proof and pleading requirements but later noting that defendants are
not "at the mercy of vague generalized pleadings" because *trial courts* may
require specific pleading from a plaintiff); *Kesterson v. Moritsugu*, No. 96-5898,
1998 WL 321008, at *4 (6th Cir. June 3, 1998) (unpublished disposition)
(explaining that plaintiff's complaint was not held to a heightened pleading
standard); *id.* at *8-10 (Moore, C.J., dissenting) (accusing the majority of
applying a heightened pleading standard and arguing the standard is not proper
after *Crawford-El*); *Smith v. Bd. of County Comm'rs*, No. 97-3107, 1998 WL
321045, at *2 (6th Cir. June 2, 1998) (unpublished disposition) (applying the
Sixth Circuit's heightened pleading requirement but noting that the Supreme
Court in *Crawford-El* approved a *trial court's* requirement of specificity).

order a reply to the defendant's or a third party's answer under Federal Rule of Civil Procedure 7(a), or grant the defendant's motion for a more definite statement under Rule 12(e). Thus, the court may insist that the plaintiff "put forward specific, nonconclusory factual allegations" that establish improper motive causing cognizable injury in order to survive a prediscovery motion for dismissal or summary judgment. *Siegert v. Gilley*, 500 U.S. 226, 236 (1991) (KENNEDY, J., concurring in judgment). This option exists even if the official chooses not to plead the affirmative defense of qualified immunity.

*Crawford-El*, 118 S. Ct. at 1596-97 (duplicate citations omitted).

This court respectfully disagrees with the First Circuit in its conclusion that the above language from *Crawford-El* saves circuit-imposed heightened pleading requirements. The passage in reality constitutes a rejection of deviations from the Federal Rules of Civil Procedure combined with an instruction to federal trial judges to exercise their discretion under the Federal Rules to manage cases in a way that serves both the purposes of qualified immunity and § 1983. *See id.* at 1596-98. Furthermore, the Court in *Crawford-El* was careful to distinguish between the D.C. Circuit's solution to protect government officials from insubstantial claims, which it rejected, and the options otherwise available under the Federal Rules of Civil Procedure for *federal trial judges* to deal with this concern. *See id.*; *see also id.* at 1587 (defining the broad issue presented in the case as whether "the *courts of appeals* may craft special procedural rules" for cases involving constitutional claims of improper motive against government

-20-

officials (emphasis added)). This court's analysis is buttressed by the following language in *Crawford-El*:

> It is the district judges rather than appellate judges like ourselves who have had the most experience in managing cases in which an official's intent is an element. Given the wide variety of civil rights and "constitutional tort" claims that trial judges confront, broad discretion in the management of the factfinding process may be more useful and equitable to all the parties than the categorical rule imposed by the Court of Appeals.

*Id.* at 1598. Thus, the circuit courts are admonished in civil rights cases not to impose management rules which deviate from those express in the statute and rules of procedure, and the district courts are encouraged to use the provisions of the Federal Rules of Civil Procedure to manage these cases.

We conclude that this court's heightened pleading requirement cannot survive *Crawford-El*. There is no relevant difference between the D.C. Circuit's heightened burden of proof at summary judgment and this court's heightened pleading requirement which justifies the continuing viability of the latter after *Crawford-El*. *See Nance*, 147 F.3d at 590 (citing *Crawford-El* for the proposition that "civil rights complaints are not held to a higher standard than complaints in other civil litigation"). Like the D.C. Circuit's heightened burden of proof, this court's heightened pleading requirement was based on *Harlow*. *See Breidenbach*, 126 F.3d at 1292. Nevertheless, as the Supreme Court made clear in *Crawford-El*, neither the holding nor the reasoning of *Harlow*, a qualified immunity case,

warranted a change in the requirements of a plaintiff's affirmative case. *See Crawford-El*, 118 S. Ct. at 1590-94. Like the D.C. Circuit's heightened proof requirement, this court's heightened pleading requirement finds no support in the Federal Rules of Civil Procedure and constitutes a deviation from the notice-pleading standards of Rule 8. *See* Fed. R. Civ. P. 8(a) ("A pleading which sets forth a claim for relief . . . shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . ."); Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other condition of mind of a person may be averred generally."). Additionally, the manner in which the Court framed the "broad" question presented for appeal—"whether the courts of appeals may craft special procedural rules for [civil rights cases that require proof of improper motive] to protect public servants from the burdens of trial and discovery"—suggests that the Court's ruling is not limited to the D.C. Circuit's heightened burden of proof. *See Crawford-El*, 118 S. Ct. at 1587. Finally, to the extent the Supreme Court considered whether a court may require a plaintiff to plead "'specific, nonconclusory factual allegations'" to survive a prediscovery motion for dismissal, it concluded this option resides in the discretion of federal trial judges, not federal circuit courts. *Id.* at 1596-97 (quoting *Siegert v. Gilley*, 500 U.S. 226, 236 (1991) (Kennedy, J., concurring in judgment)).

This court reiterates that trial judges retain discretion to order a reply to a defendant's answer, grant a defendant's motion for a more definite statement, or tightly confine discovery. *See* Fed. R. Civ. P. 7(a), 12(e); *Crawford-El*, 118 S. Ct. at 1596-97. The district court in this case, however, thought Plaintiffs had alleged sufficient facts to be allowed discovery. *See Currier v. Doran*, No. CIV 97-0477 BB/JHG, slip op. at 7 (D.N.M. Aug. 19, 1999) ("The Court cannot say Plaintiffs would be unable to recover damages from Doran under any set of facts alleged in the complaint."); *id.* at 8 ("[T]he Court believes Plaintiffs have alleged sufficient facts to be allowed discovery . . . ."); *id.* at 9 ("Given the stay of discovery that has been imposed in this case, it would not be fair to require the Plaintiffs to assert more facts than they have been able to allege at this point."). Therefore, this court will review Defendants' motions under the customary motion to dismiss standard: "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley*, 355 U.S. at 45-46.

## C. Constitutional Violation

Once a defendant raises the defense of qualified immunity in the context of a motion to dismiss, a court must first determine whether the plaintiff has asserted a violation of federal law. *See Ramirez*, 222 F.3d at 1241; *Dill v. City of Edmond*,

155 F.3d 1193, 1204 (10th Cir. 1998). In this case Plaintiffs allege that their Fourteenth Amendment rights were violated when Defendants affirmatively removed them from the custody of their mother and then placed them in the custody of their abusive father. Plaintiffs also allege Defendants violated their Fourteenth Amendment rights by failing to protect them while they were in state custody and by failing to protect them once they were placed in the custody of their father.

Defendants maintain Plaintiffs' claims are barred by *DeShaney*. In *DeShaney* the Supreme Court considered the Fourteenth Amendment claims of Joshua Deshaney, a victim of severe child abuse, against the local department of social services and the employees thereof. *See Deshaney*, 489 U.S. at 191. Joshua lived with his natural father. In 1982, the Winnebago County Department of Social Services ("DSS") first investigated abuse charges against Joshua's father. The DSS took no action to remove Joshua at the time. In 1983 Joshua was admitted to a hospital with multiple bruises and abrasions. DSS obtained an order placing Joshua in the temporary custody of the hospital. DSS, along with other professionals assembled by the county to assess Joshua's situation, decided there was insufficient evidence of child abuse to retain Joshua in the custody of the court. For the next six months the assigned DSS caseworker was made aware of several factors indicating that Joshua was being abused, but DSS took no

action. Joshua was eventually beaten so violently that he fell into a life-threatening coma. *See id.* at 192-93.

Joshua claimed DSS and its employees had violated his constitutional rights by "failing to intervene to protect him against a risk of violence at his father's hands of which they knew or should have known." *Id.* The Supreme Court rejected Joshua's claim. The Court stated that the Due Process Clause "generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *Id.* at 196. The Court, however, went on to state the following:

> While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them. That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter. Under these circumstances, the State had no constitutional duty to protect Joshua.

*Id.* at 201.

Relying on the above language in *DeShaney*, this court has held that "state officials can be liable for the acts of third parties where those officials 'created the danger' that caused the harm." *Seamons v. Snow*, 84 F.3d 1226, 1236 (10th Cir. 1996) (quoting *Uhlrig v. Harder*, 64 F.3d 567, 572 (10th Cir. 1995)). In

-25-

*Armijo*, this court delineated the contours of a "danger creation" cause of action. *See* 159 F.3d at 1262-63. To make out a proper danger creation claim, a plaintiff must demonstrate that (1) the charged state entity and the charged individual actors created the danger or increased plaintiff's vulnerability to the danger in some way; (2) plaintiff was a member of a limited and specifically definable group; (3) defendants' conduct put plaintiff at substantial risk of serious, immediate, and proximate harm; (4) the risk was obvious or known; (5) defendant acted recklessly in conscious disregard of that risk; and (6) such conduct, when viewed in total, is conscience shocking. *See id.*

Defendants, relying on *DeShaney*, argue that Plaintiffs have not alleged a constitutional violation because custody was simply transferred from one natural parent to another; thus, Defendants claim, they did not create the danger. *DeShaney* does not, however, compel this conclusion. In this case, Anthony and Latasha were removed from their mother and placed with their father. In *DeShaney*, Joshua was removed from his father and then returned to his father. *See DeShaney*, 489 U.S. at 192. Anthony and Latasha would not have been exposed to the dangers from their father but for the affirmative acts of the state; the same cannot be said for Joshua in *DeShaney*.

The limited caselaw does not support Defendants' theory that they are shielded by *DeShaney* because Anthony and Latasha were placed in the custody of

their natural father. In *Ford v. Johnson*, the United States District Court for the Eastern District of Pennsylvania considered the constitutional claims of the mother of a child who had been beaten to death by his father. *See* 899 F. Supp. 227, 233 (E.D. Pa. 1995). The child had been in state custody before being placed with her father by court order after an investigation and recommendation by local social workers. *See id.* The court decided that the mother had stated a constitutional claim by alleging that the social workers failed to investigate the father and failed to report information to the juvenile court which would have disqualified the father from gaining custody. *See id.* at 232. The court stated that just because "the child is placed with a parent as opposed to a foster parent should not change the standards by which social agencies and their employees conduct their investigations." *Id.* at 233.

Similarly, in *Tazioly v. City of Philadelphia*, the same court held that the "state-created danger theory may apply in cases where a state actor has rendered a minor more vulnerable to injury at the hands of the minor's biological parent." No. CIV.A. 97-CV-1219, 1998 WL 633747, at *11 (E.D. Pa. Sept. 10, 1998) (unpublished disposition). In *Tazioly* the City Department of Human Services removed a child from a foster parent and placed him in the custody of his mother. The court distinguished *DeShaney* by noting that in *DeShaney* there was insufficient evidence of abuse to retain the child in state custody, while defendant

-27-

social workers in the *Tazioly* case had actual knowledge that the biological mother was "unfit and dangerous." *Id*. at \*9.

While language in the Seventh Circuit's opinion in *K.H v. Morgan*, 914 F.2d 846, 852-53 (7th Cir. 1990), suggests that placing a child with a family member might insulate the state from constitutional liability, the Seventh Circuit seems to have since reconsidered its earlier dicta. In a recent case involving a suit brought against social workers as the result of injuries suffered while a child was abused at her father's home, the court stated that "[i]f the [social workers] knowingly placed [plaintiff] in a position of danger, they would not be shielded from liability by the decision in *DeShaney*." *Bank of Ill. v. Over*, 65 F.3d 76, 78 (7th Cir. 1995). Furthermore, the reasoning used by the Seventh Circuit in *Morgan* actually supports constitutional liability when custody is transferred from one parent to another. The court stated that "[t]he state could have left [plaintiff] to the tender mercies of her parents without thereby violating her rights under the Constitution. But having removed her from their custody the state assumed at least a limited responsibility for her safety." *Morgan*, 914 F.2d at 849. Under this reasoning it would be arbitrary to allow the state to avoid this responsibility merely by placing the child with another relative. *See S.S. v. McMullen*, 225 F.3d 960, 968 (8th Cir. 2000) (en banc) (Gibson, J., dissenting) ("These distinctions . .

. between foster parents and natural parents [] are arbitrary."), *petition for cert. filed*, 69 U.S.L.W. 3410 (U.S. Dec. 8, 2000) (No. 00-946).

Thus, neither *DeShaney* nor other authorities shield the Defendants. When the state affirmatively acts to remove a child from the custody of one parent and then places the child with another parent, *DeShaney* does not foreclose constitutional liability.

Having established that *DeShaney* does not foreclose liability, we now examine each of the Defendants individually to determine if Plaintiffs have pleaded sufficient facts to state a cause of action under the danger creation theory.

**1. Doran**

Doran first became involved in the case before the May 10, 1993, custody hearing granting physical custody to Vargas and legal custody to CYF. At the hearing Doran failed to alert the Children's Court to Vargas' history of financial irresponsibility. Just a short time later, in late July and early August, Doran noticed bruises on the children and did not investigate further after being told the bruises were the result of falls. Three times during the late summer of 1993, Juarez made allegations that Vargas and his girlfriend were abusing the children, including the very specific accusation that the children were dunked in a bathtub full of water as punishment; Doran did not investigate these allegations. On October 19, 1993, Doran was responsible for the Children's Court's decision to

grant Vargas legal custody, through either his failure to investigate and report to the court or through his affirmative recommendation.[6]

Plaintiffs also make various allegations as to Doran's involvement after legal custody was awarded to Vargas. The district court considered these post-custody allegations in determining that Plaintiffs had met the requirements of danger creation liability. *See Currier v. Doran*, No. CIV 97-0477 BB/JHG, slip op. at 6-7 & n.3 (D.N.M. Aug. 19, 1999). The danger creation theory, however, focuses on the affirmative actions of the state in placing the plaintiff in harm's way. Plaintiffs cannot rely on Defendants' failure to intervene once custody was given to Vargas to state a danger creation claim if the Defendants' affirmative conduct in placing the child with Vargas does not satisfy the *Armijo* danger creation requirements. As the Supreme Court stated in *DeShaney*, "the State does not become the permanent guarantor of an individual's safety by having once offered him shelter." *DeShaney*, 489 U.S. at 201. Thus, we will only consider Doran's conduct before legal custody was given to Vargas.

---

[6]The parties appear to agree that legal custody, not physical custody, is the benchmark date by which to analyze Plaintiffs' claims. There is conflicting evidence as to when legal custody was granted Vargas; Plaintiffs claim legal custody was awarded on October 19, 1993, while Defendants argue legal custody was transferred on June 23, 1993. The district court allowed discovery on this limited question, but did not decide the issue. *See Currier v. Doran*, No. CIV 97-0477 BB/JHG, slip op. at 2 (D.N.M. Aug. 19, 1999). Because we are treating Defendants' motions as motions to dismiss, we will assume that legal custody was given to Vargas on October 19, 1993, as Plaintiffs allege.

Doran's conduct meets the danger creation theory of liability spelled out in *Armijo*. Doran "created the danger or increased the plaintiff[s'] vulnerability to the danger" through his failure to investigate the numerous bruises and allegations of abuse and his responsibility for the court order granting legal custody to Vargas.[7] *Armijo*, 159 F.3d at 1263; *see also Ford*, 899 F. Supp. at 233 (finding a constitutional claim was stated against defendant social workers who failed to investigate and report to juvenile court circumstances concerning father given custody of a child he subsequently beat to death). Latasha and Anthony were members "of a limited and specifically definable group": children the state has removed from their natural parent and taken into state custody. *Armijo*, 159 F.3d at 1262 (quotation omitted). By failing to investigate the allegations of child abuse and by recommending that Vargas assume legal custody, Doran's conduct put Anthony and Latasha at obvious risk of serious, immediate, and proximate harm, a harm that Doran recklessly and consciously disregarded.

---

[7]It is true that the conduct Plaintiffs complain of is partially a failure by Doran to act on particular allegations of abuse. Doran's failure to investigate allegations of abuse while the children were in state legal custody should be distinguished, however, from a claim that the state failed to rescue the children once legal custody was given to Vargas. Doran's failure to investigate allegations of abuse should be viewed in the general context of the state's affirmative conduct in removing the children from their mother and placing the children with their father.

It is a somewhat closer question whether Doran's conduct is "conscience shocking." *Id.* at 1263 (quotation omitted). This court has recognized three basic principles guiding the evaluation of substantive due process claims that are particularly relevant to this determination: (1) the general need for restraint; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policy decisions impacting public safety. *See Uhlrig v. Harder*, 64 F.3d 567, 573 (10th Cir. 1995). *Armijo* involved a decision by school officials to send home a distraught and potentially suicidal student, when it was known that there were firearms present at his house and that his parents were not home, despite school disciplinary policy that prevented out-of-school suspensions when a student's parent was not home. *Armijo*, 159 F.3d at 2156-57. This court determined that this decision could be "construed as conscience-shocking, depending on context as determined after a full trial." *Id.* at 1264.

The allegations in Plaintiffs' complaint against Doran, if true, are at least as conscience-shocking as the facts in *Armijo*. It is important to remember that Doran's conduct must be "viewed in total," and thus the cumulative impression of Doran's conduct should be considered. *Id*. In light of the initial information Doran had about Vargas' financial irresponsibility, and in light of the numerous bruises and allegations of abuse, Doran's failure to investigate the bruises and allegations and his subsequent responsibility for the court order granting Vargas

-32-

legal custody could be conscience shocking, depending, of course, on further context as provided by discovery. *See id*. Thus, Plaintiffs have alleged sufficient facts to support a danger creation claim against Doran.

**2. Sentell**

Defendant Sentell's limited involvement in this matter came only after Vargas had been awarded both physical and legal custody. On January 10, 1994, a request for an investigation of possible physical abuse of Anthony was made to Sentell. Sentell reviewed the file on Doran's November investigation of abuse and then referred the request to Medina for further action. On March 16, 1994, Doran referred another allegation of abuse to Sentell. Sentell discovered bruises on both Latasha and Anthony but concluded the injuries were not the result of abuse.

Plaintiffs do not argue that Sentell was personally involved in creating the danger the children faced. Instead, Plaintiffs argue Sentell was constitutionally required to rescue the children because she was aware that her fellow co-workers had created the danger.

This court has stated that "state officials may be liable for injuries caused by a private actor where *those officials* created the danger that led to the harm." *Sutton*, 173 F.3d at 1237 (emphasis added). In *Sutton*, this court refused to extend constitutional liability against one state defendant because he had not

affirmatively created a dangerous situation, even though another state actor had created the dangerous situation. *See id.* at 1239. Plaintiffs distinguish *Sutton* by noting that Sentell, unlike the defendant in *Sutton*, was aware that other state actors had created the danger and was presented with a clear opportunity to rescue the children. Although this is perhaps a closer case than *Sutton*, Sentell nevertheless had no constitutional duty to rescue the children. The language of *Sutton* explaining that only officials who created the danger might have a duty to rescue, the principle that the "Due Process Clauses generally confer no affirmative right to government aid," and the general need for restraint in evaluating substantive due process claims all dictate the conclusion that Sentell had no constitutional duty to rescue. *DeShaney*, 489 U.S. at 196; *see also Uhlrig*, 64 F.3d at 573 (recognizing the need for restraint in evaluating substantive due process claims). Thus, because Plaintiffs have not alleged a constitutional violation by Sentell, the district court's denial of Sentell's motion is reversed.

### 3. Medina

Defendant Medina made the initial visit to Juarez's home, removed the children from the home, and delivered them into the physical custody of CYF. Medina conducted an investigation and reported in the custody hearing that Vargas had not supported the children while they were with Juarez. Medina then had no involvement in the case until after physical and legal custody was

transferred to Vargas. On January 10, 1994, Medina investigated an abuse charge. Medina found bruises on Anthony's buttocks but concluded the bruises were the result of a fall. During this visit, Latasha told Medina that she had been spanked with a belt. Medina's last involvement in the case came when she instructed Juarez to stop making allegations of abuse because it was traumatizing the children.

Medina's involvement in the initial removal of the children from Juarez cannot support a danger creation claim. Moreover, the January 10, 1994, investigation by Medina came after legal and physical custody had been transferred to Vargas. Because Medina did not create the danger, and because Medina is not constitutionally required to rescue a plaintiff from danger created by another state actor, Medina was not constitutionally obligated to rescue the children during the January 1994 visit.

Plaintiffs argue that Medina can be liable for danger creation because she instructed Juarez to stop making allegations of abuse. Because of this affirmative conduct, Plaintiffs reason, Juarez was discouraged from reporting additional signs of abuse, and the risk to the children was intensified. After an examination of similar cases in other circuits, this court concludes that Plaintiffs have alleged a constitutional violation by Medina in her instruction to Juarez to stop making allegations of abuse.

In *Dwares v. City of New York*, 985 F.2d 94, 96-97 (2nd Cir. 1993), flag-burning demonstrators alleged that police officers had violated their constitutional rights when the police officers told "skinheads" that they would not interfere if the skinheads assaulted the demonstrators. The Second Circuit concluded that a constitutional violation had been alleged, distinguishing the case from *DeShaney*. *See id.* at 98-99. The court explained that the police officer's affirmative conduct had made the demonstrators more vulnerable to assault, even if the police officers were under no constitutional duty to rescue the demonstrators from an assault. *See id.* at 99.

*Freeman v. Ferguson*, 911 F.2d 52, 53-54 (8th Cir. 1990), involved a claim that the police chief had directed officers not to respond to a woman's complaints that her estranged husband was violating his restraining order. The estranged husband, a close friend of the police chief, eventually killed his former wife. *See id.* The Eighth Circuit distinguished *DeShaney* and reversed the trial court's dismissal of the claim by the wife's estate against the police chief, noting that the murder was "the result of an affirmative act by a state actor to interfere with the protective services which would have otherwise been available in the community." *Id*. at 54; *cf. Ross v. United States*, 910 F.2d 1422, 1431 (7th Cir. 1990) (allowing recovery under the Constitution for injury resulting from state prevention of private rescue attempt).

While reiterating the basic holding of *DeShaney* that the government is under no constitutional obligation to rescue private citizens from harm, these cases also illustrate that the state can be liable when it affirmatively places private citizens in harm's way by removing what would otherwise be safety valves. This court has also stated that the state creates danger when it cuts off potential sources of private aid. *See Armijo*, 159 F.3d at 1263 (quoting from *Johnson v. Dallas Ind. Sch. Dist.*, 38 F.3d 198, 201 (5th Cir. 1994)). By discouraging Juarez from reporting additional indications of abuse, Medina increased the children's vulnerability to Vargas' abuse. While Medina certainly was not constitutionally required to rescue the children, her comments to Juarez allegedly discouraged the mother from reporting further evidence of abuse to either the police or CYF, which might then have acted to rescue the children.

That the potential aid Medina's conduct tended to foreclose was from a state source rather than a private source is not constitutionally significant. The Eighth Circuit stated in *Freeman* that a state actor cannot "interfere with the protective services which would have otherwise been available in the community." 911 F.2d at 54. This is precisely what Medina did when she instructed Juarez to stop making allegations of abuse. This court's language in *Armijo* stating that the state can be liable when it cuts off potential sources of private aid does not preclude today's decision that a state actor can also be

constitutionally liable when it cuts off potential sources of state aid. Although Medina was constitutionally free to ignore the pleas of Juarez and offer no assistance, her behavior allegedly discouraged Juarez from seeking the help of other CYF employees or other governmental sources of help such as the police.

Keeping in mind that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," this court agrees with the district court that Plaintiffs have properly alleged a danger creation claim against Medina. *Conley*, 355 U.S. at 45-46. Medina increased the children's vulnerability to Vargas, the first requirement of a danger creation cause of action. Medina's conduct could have put Anthony and Latasha at obvious risk of serious, immediate, and proximate harm, a harm that Medina recklessly and consciously disregarded. Medina's conduct could be conscience shocking, depending on further context as provided by discovery. *See Armijo*, 159 F.3d at 1264. Thus, assuming Plaintiffs will be able to prove that Medina's conduct was a cause of the harm to the children, Plaintiffs have alleged a danger creation constitutional claim against Medina.

### 4. Gonzales

Plaintiffs allege that Gonzales "knowingly, recklessly, or with deliberate indifference toward and callous disregard for the rights of Latasha and Anthony,

failed to instruct, supervise, control, and discipline on a continuing basis Defendants Medina, Doran, and Sentell in their duties so as to refrain from depriving Latasha and Anthony of their constitutional and statutory rights." In the context of a motion to dismiss, this court agrees with the district court that Plaintiffs have properly alleged that Gonzales, in her role as supervisor, deprived Plaintiffs of their constitutional rights. *See Conley*, 355 U.S. at 45-46.

This court has stated that when "a superior's failure to train amounts to deliberate indifference to the rights of persons with whom his subordinates come into contact, the inadequacy of training may serve as the basis for § 1983 liability." *Sutton*, 173 F.3d at 1240. In addition, as with all substantive due process claims, the supervisor's conduct must shock the conscience. *See id.* at 1241. Plaintiffs claim that Gonzales had knowledge that the alleged unconstitutional behavior by Doran and Medina was occurring. Having knowledge that subordinates are depriving young children of their constitutional rights, Gonzales' failure to correct this conduct amounts to a deliberate indifference to the rights of Anthony and Latasha that could be conscience shocking, depending on context as provided by discovery. Plaintiffs have therefore alleged a constitutional deprivation by Gonzales in her role as supervisor. *See id.* at 1241 (finding supervisor liability when assault was committed by private actor).

**D. Clearly Established Law**

Once defendants raise the defense of qualified immunity, the plaintiff must demonstrate to the court that the law on which the plaintiff relies was clearly established at the time of the defendants' actions. *See Hilliard v. City & County of Denver*, 930 F.2d 1516, 1518 (10th Cir. 1991). The plaintiff must prove the right was sufficiently clear that a reasonable official would have understood that his conduct violated the right. *See Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Medina*, 960 F.2d at 1498. It is not necessary, however, for plaintiffs to find a case with exact corresponding factual circumstances; defendants are required to make "reasonable applications of the prevailing law to their own circumstances." *Murrell v. Sch. Dist. No. 1*, 186 F.3d 1238, 1251 (10th Cir. 1999). In addition, contrary authority from other circuits does not preclude a finding that the law in this circuit was clearly established, if the contrary authority can be distinguished. *See Anaya v. Crossroads Managed Care Sys.*, 195 F.3d 584, 594 (10th Cir. 1999).

**1. Doran**

In *DeShaney*, the Supreme Court held that state officials could not be liable for failing to protect citizens from private violence. *See Deshaney*, 489 U.S. at 197. The Court was careful to note, however, that the state had played no part in creating the danger or leaving the plaintiff more vulnerable to the danger. *See id.* at 200-01. The clear implication of the Court's language, which was written in 1989, was that a state could be liable when it affirmatively acts to create, or increases a plaintiffs vulnerability to, danger from private violence. Any doubts as to the possible inference to be drawn in this circuit from the Court's language in *DeShaney* were dispelled by the *Medina* case. In *Medina*, decided in 1992, this court contrasted the social workers in *DeShaney* with police officers who recklessly chased a suspect, noting that the police officers "affirmatively and directly changed the status quo . . . by pursuing an allegedly unconstitutional chase. *DeShaney* is therefore inapplicable." *Medina*, 960 F.2d at 1497 n.5. Other circuit courts also recognized the danger creation theory before Defendants' conduct in question began. *See Reed v. Gardner*, 986 F.2d 1122, 1126 (7th Cir. 1993) (explaining that plaintiffs "may state claims for civil rights violations if they allege state action that creates, or substantially contributes to the creation of, a danger or renders citizens more vulnerable to a danger tha[n] they otherwise would have been"); *Dwares*, 985 F.2d at 99 ("[A]n allegation that the officers in some way had assisted in creating or increasing the danger to the victim would

-41-

indeed implicate [the victim's due process rights].”); *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992) (en banc) (“[T]he Due Process Clause imposes a duty on state actors to protect or care for citizens . . . when the state affirmatively places a particular individual in a position of danger the individual would not otherwise have faced.”); *L.W. v. Grubbs*, 974 F.2d 119, 121 (9th Cir. 1992) (“The ‘danger creation’ basis for a claim . . . involves affirmative conduct on the part of the state in placing the plaintiff in danger.”); *McComb v. Wambaugh*, 934 F.2d 474, 483 (3rd Cir. 1991) (holding that *DeShaney* prevented recovery because local social workers had not created the danger of private abuse); *Freeman*, 911 F.2d at 55 (“*DeShaney* . . . establishes that the increased danger created in a custodial setting is sufficient to trigger the [Due Process Clause].”). Based on *Deshaney*, *Medina*, and the ample case law from other circuits, this court concludes that a reasonable state official would have known in 1993 and 1994 that reckless, conscience shocking conduct that altered the status quo and placed a child at substantial risk of serious, immediate, and proximate harm was unconstitutional.

Our conclusion is supported by *Armijo*. In *Armijo* this court determined that “danger creation jurisprudence was clearly established as a matter of law” by late 1994. *Armijo*, 159 F.3d at 1262. The events prompting this lawsuit began in late April 1993 and continued until May 1994. As the district court correctly

noted, the law of danger creation was not so radically altered between the time Defendants in this case acted and the time the defendants in the *Armijo* case acted as to justify a different legal conclusion.[8]

Our conclusion that danger creation law was clearly established at the time of the events underlying this suit is not undermined by the Seventh Circuit's dicta in *K.H. v. Morgan* suggesting that placing a child with a family member might insulate the state from all constitutional liability. *See* 914 F.2d at 852-53. Never before has this court indicated that state employees would be justified in relying on the isolated dicta of another circuit court to create an exception to a general theory of liability established by Tenth Circuit and Supreme Court cases, and it will not do so now. Such a rule would make state employees immune from constitutional obligations determined to exist by this court or the Supreme Court, based on the non-binding musings of other circuit courts.

---

[8]Our conclusion is not altered to the extent that some of our pre-1995 cases can be interpreted to not require "conscience-shocking" behavior. *Compare Medina*, 960 F.2d at 1496, *with Uhlrig*, 64 F.3d at 574. For one, the "shock the conscience" standard has been traced by this court to the 1992 Supreme Court case of *Collins v. City of Harker Heights Texas*, 503 U.S. 115, 126 (1992). *See Uhlrig*, 64 F.3d at 573. The law is clearly established when there is a Supreme Court case on point. *See Medina*, 960 F.2d at 1498. In addition, the shock the conscience requirement is an *additional* hurdle for plaintiffs attempting to prove liability. Thus, even if Defendants were not aware of the requirement, the constitutional standard they would then have operated on would have been higher. They cannot now claim, therefore, that they were unaware their conduct was illegal because the shock the conscience requirement was not clearly established.

**2. Medina**

As the above discussion demonstrates, the danger creation cause of action was clearly established at the time of the events underlying this suit. The circumstances surrounding Doran's involvement with the children resulted in a relatively straight-forward application of the doctrine. The particular theory of danger creation on which Plaintiffs have stated a claim against Medina, however, is substantially less established in the case law. There are no Tenth Circuit cases in which a government official, by her statements discouraging citizens from seeking protection from government officials for harm inflicted by other private citizens, is held to have created danger of private abuse. The closest support for this particularly application of the danger creation theory comes from two cases decided by other circuits. *See Dwares*, 985 F.2d at 94 (decided by the Second Circuit in 1993); *Freeman*, 911 F.2d at 52 (decided by the Eighth Circuit in 1990). These two cases, however, involve circumstances which are not sufficiently analogous to those surrounding Medina's involvement in this case to constitute clearly established law. In *Dwares*, the police officers directly told the citizens committing the violence that they would not interfere with the citizens' assault on other private citizens; Medina made no such statement to Vargas or his fiancee. *See Dwares*, 985 F.2d at 97. In *Freeman*, the police chief directed officers not to respond to a citizen's complaint; Medina made no such statement

-44-

to her co-workers or to any other government entity which might have responded to Juarez's requests for help. *See Freeman*, 911 F.2d at 53-54.

Plaintiffs can meet their burden to show the law was clearly established by relying on cases from other circuits, but only if "the clearly established weight of authority from other courts . . . have found the law to be as the plaintiff maintains." *Medina*, 960 F.2d at 1498. This standard has not been met in this case. A reasonable official in Medina's position would not have understood that her conduct created a claim under the danger creation theory. Thus, Medina is entitled to qualified immunity.

### 3. Gonzales

This court has long held that a supervisor may be individually liable when there is "essentially a complete failure to train, or training that is so reckless or grossly negligent that future misconduct is almost inevitable." *Meade v. Grubbs*, 841 F.2d 1512, 1528 (10th Cir. 1988). While Gonzales' alleged failure to train resulted in injury to Plaintiffs by a private actor, it was also clearly established in 1993 and 1994, as the discussion *supra* demonstrates, that state actors can be liable for private violence when they create the danger or increase the plaintiff's vulnerability to danger.

## IV. CONCLUSION

For the reasons stated above, this court **AFFIRMS** the district court's denial of Doran's and Gonzales' motions for summary judgment, and **REVERSES** the district court's denial of Medina's and Sentell's motion for summary judgment.