**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**July 26, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

SCOTT JOHNSON, as personal
representative of the estate of Graciela
Cano a/k/a Grace Lee Bogey,
deceased; and LORENA TORREZ,

      Plaintiffs - Appellants,

v.

ANNE HOLMES; BONNIE
VEHSTEDT; KAREN ZARATE;
LYDIA R. SAENZ; SONIA PEREZ;
VIRGINIA VILLAREAL; VIVIANE
ENCINIAS; GINGER BOWMAN;
DENISE H. NARVAEZ; CHILDREN,
YOUTH and FAMILIES
DEPARTMENT, New Mexico;
VERONICA BOGEY; TERRY
BOGEY a/k/a TERI BOGEY,

      Defendants - Appellees.

No. 04-2286

---

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. CIV-02-1239 JB/KBM)**

---

Paul J. Kennedy (Adam S. Baker with him on the briefs), Kennedy & Han,
Albuquerque, New Mexico, appearing for Plaintiffs-Appellants.

Michael Dickman, Assistant Attorney General, Santa Fe, New Mexico for
Defendant-Appellee, Children, Youth and Families Department, New Mexico.

Randolph B. Felker, Felker, Ish, Hatcher, Ritchie, Sullivan & Geer, Santa Fe, New Mexico, appearing for Defendants-Appellees.

Timothy V. Flynn-O'Brien, Albuquerque, New Mexico, appearing for Defendants-Appellees.

---

Before **LUCERO**, **BALDOCK**, and **McCONNELL**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

---

This case is not much about grace; it is about Grace, a child born with severe spina bifida. Grace was abandoned soon after birth to the custody of the New Mexico Children, Youth, and Families Department and placed with a foster family. Over the foster family's objection, the Children, Youth, and Families Department allowed Veronica Bogey to adopt Grace soon after Grace's first birthday. The basis of the foster family's objection was that they thought Bogey was actually a man pretending to be a woman because of Bogey's extensive facial hair. Veronica Bogey's father – a self-described hermaphrodite who claims also to be Veronica Bogey's mother – then moved in. Responsibility for her case bounced around from one over-worked social worker to another and concerns about her situation were investigated by an uninquisitive investigator. Grace's situation quickly turned from muddled to tragic: she died four weeks after the adoption was finalized, apparently as the result of being beaten to death.

This case is legally about the claimed failures of the Children, Youth, and Families Department (the "Department") to properly discharge their custodial obligations of investigation and oversight, particularly during the period between placement for adoption and the time adoption decree was entered. The argument is that, but for the failure of oversight by the Department during the months leading up to the entry of the formal decree of adoption, the adoption would not have been permitted and Grace would not have been placed in mortal danger.

Scott Johnson, as personal representative of the estate of the child, renamed Grace Bogey at adoption, filed suit under state tort law and 42 U.S.C. § 1983 against the Department and a number of its employees. His state tort claims were dismissed as a matter of law, his § 1983 claims against several Department employees were dismissed on summary judgment, and a jury entered a verdict in favor of two Department employees on his remaining claims. He now appeals, arguing that: (1) sovereign immunity does not bar his state tort claims against the Department and the Department employees; (2) the district court erred in granting summary judgment to Virginia Villareal and Ginger Bowman, Department employees responsible for monitoring Grace's placement and an investigation into child abuse allegations raised against the adoptive mother; and (3) the jury verdict in favor of Anne Holmes and Sonia Perez Sanchez, two other Department employees involved with the adoption, should be overturned because the jury instructions improperly required a determination that their actions "shocked the

conscience" in order to find that they violated the child's substantive due process rights.

Under New Mexico law, it is clear that the State did not waive sovereign immunity. The jury instructions used in the trials of Holmes and Perez were clearly in accordance with our substantive due process jurisprudence. The district court's decision granting summary judgment to Bowman was also proper. However, there are disputed questions of material fact as to whether Villareal properly exercised her professional judgment by failing to investigate several disturbing events that took place while she was the primary social worker assigned to Grace's case. We conclude the district court's dismissal of the claims against the Department, its grant of summary judgment to Bowman, and the jury verdicts in favor of Holmes and Perez should be **AFFIRMED**. Grant of summary judgment to Villareal, however, should be **REVERSED** and the case **REMANDED** to the district court for proceedings consistent with this opinion.

**I**

In 1997, Lorena Torrez gave birth to Graciela Cano a/k/a Grace Lee Bogey ("Grace"). As noted, Grace was born with severe spina bifida and, because of her special needs, Torrez soon proved unable to care for her. Torrez thus relinquished all parental rights, whereupon the Department assumed legal custody and began efforts to find adoptive parents. In the interim, Grace was placed with foster parents Charlene and Graydon Blevins.

The Department conducted several "home studies" in its efforts to find permanent adoptive parents for Grace, including one by Denise Narvaez, a Department employee, of Veronica Bogey, a single schoolteacher previously licensed by the Department as a qualified adoptive parent. Viviane Encinias, an adoption consultant, forwarded the Bogey home study along with several other home studies to Anne Holmes, a Department employee previously assigned as Grace's treatment worker.

Department officials decided to focus on Bogey and held a "matching staffing" meeting to discuss Bogey as the potential adoptive parent and her ability to care for Grace. In attendance were Encinias, Holmes, Narvaez, Lydia Saenz, a treatment supervisor, Sonia Perez,[1] the placement worker assigned to provide post-placement services for Grace, and Virginia Villareal, Perez's supervisor. At the meeting, they decided that Bogey was a good match for Grace. An expert hired by the personal representative described the process as having been conducted in an "excessively hasty" manner.

The Department's ultimate decision to place Grace with Bogey was not free from hesitation and doubt. Holmes expressed concern that Bogey would not be able to meet Grace's needs because she was single. Charlene Blevins objected because she believed Bogey appeared to be a man pretending to be a woman.

---

[1] During the period at issue in this case, Perez was married and changed her name to Sonia Sanchez. For the purposes of this opinion, she will be referred to as Sonia Perez.

Both of these worries were determined by the Department to be unfounded. The Department then proceeded to the next steps required to permanently place Grace with Bogey: a home inspection and "full disclosure," during which Department officers fully explained to Bogey the extent of Grace's medical problems, and a visit by Bogey with Grace in the foster home.

On completion of this process, the Department allowed preadoptive placement with Bogey. Soon thereafter, Perez expressed concern that Bogey would be overwhelmed by the responsibility of caring for a child with special needs, and suggested that respite care might be appropriate. Despite this concern, the Department proceeded without offering such assistance, but did provide a monthly subsidy of $487 and agreed to cover medical expenses for any pre-existing condition not covered by Bogey's health insurance or Medicaid.

After placement, Perez, who was performing the responsibilities of two social workers due to understaffing in the Department, assumed primary responsibility for monitoring Grace's progress. Although under Department policy Perez was expected to conduct monthly home visits, Perez visited Bogey's home but two or three times over the course of almost six months. Perez did, however, monitor Grace's progress in other ways. She saw Grace in the Department's offices on two or three occasions, once picked her up at a daycare facility, and placed a number of phone calls to Bogey to discuss Grace's progress. Villareal also met with Grace during her visits to the Department's offices.

During the preadoptive placement, a nurse, Kerstin Lagestam, was hired to conduct check-ups on Grace. During her first visit to Bogey's home, Nurse Lagestam noticed swelling and a large purple bruise on the left side of Grace's face. Bogey explained that she accidently bumped Grace's face on the side of a car door.

Nurse Lagestam then began to visit Grace once each day at her day care facility. Several months after she started, Nurse Lagestam noticed marks on Grace's neck, back, and abdomen. Considering the marks to be intentionally-inflicted fingernail scratches deep enough to leave scars, Nurse Lagestam reported the injuries to her supervisor, Janie Mealand, who proceeded to call Holmes at the Department. Holmes was unavailable and, a few days later, Nurse Lagestam noticed that Grace's right hand was bruised and swollen. She promptly reported this to Mealand as well.

Mealand did not hear from Holmes for several days. When Holmes eventually returned her call, she told Mealand to call Sonia Perez. Mealand did so on March 22, 2000, and two days later, Perez told Mealand to call the Department's abuse hotline. Immediately after she heard from Perez, Mealand called the hotline: It was March 24. She did not hear back from the Department for two weeks, at which point, she called the hotline again. This time, she was told that Perez would call her back. Another week passed before Perez returned her call.

The bureaucratic morass at the Department did not only impede its ability to return phone calls; the actual investigation into the abuse allegations was stalled as well. Although Mealand had first contacted Department officials about the reported abuse much earlier, the Department did not begin its investigation until the call to the hotline was made on March 24. Bogey left for a vacation the next day, March 25. Although Perez and the Department's abuse investigator, Ginger Bowman, attempted to contact Bogey before she went on vacation and left a phone message, they were not able to reach her.

When Bogey returned from vacation on April 3, she called Perez, who told Bogey about the allegations and explained that allegations of this sort are frequently unsubstantiated. Bogey responded by saying that Grace tends to get bruises that do not heal quickly when crawling and that the pet ferret belonging to Bogey's father may have scratched Grace.

When Perez and Bowman finally conducted the required home visit following abuse allegations, Bowman examined Grace and determined that there was no evidence of physical abuse. Grace's shins were bruised, but Bowman noted that this is common among children like Grace who lack feeling in their lower extremities. According to Bowman, Grace seemed attached to Bogey and did not flinch when Bogey approached. Bogey told Bowman that any scratches or bruises were probably the result of contact with other children at day care or from incidental contact with rings that Bogey wears.

After this investigation, Bowman told Villareal and Perez that there was no evidence of abuse. She did not, however, prepare a contemporaneously written report, nor did she explain to either co-worker what she had observed. Perez offered Bogey respite care, but Bogey declined. Bowman did not contact any third party to ask about the abuse allegations.

Two months later, Perez quit her job at the Department. Because of the lack of available staffing at the Department, Villareal assumed the entirety of Perez's double caseload, as well as keeping her supervisory responsibilities. For the next two months, Villareal was the primary social worker assigned to Grace's case. During this period, substantial changes occurred in the Bogey home. First, Bogey's father, Terry Bogey, moved in. Villareal did not know that Terry Bogey was going to move in, although she did know that Bogey planned to move, along with Grace, to Wisconsin after the adoption became final in order to be closer to her father. Second, Bogey removed Grace from daycare and fired her home health nurses, leaving Grace entirely cut off from any contact with the outside world. Villareal neither investigated Terry Bogey nor the decision to remove Grace from outside contact. Despite the upheaval in Grace's life, Villareal did not visit Bogey's home once during this period

Following a hearing in Children's Court, Bogey's adoption of Grace was finalized on July 31, 2000. Both the abuse allegations and Bowman's report that

determined the allegations as being without merit were provided to the Children's Court and Grace's guardian ad litem before the finalization of the adoption.

Little more than one month later, Bogey brought Grace to a hospital emergency room because she was congested and could not breathe. Grace died soon after. On admission, hospital personnel determined that Grace's death was the result of child abuse. An autopsy report concluded that Grace died of craniocerebral blunt force, and noted that there was evidence of serious injuries to Grace's head, neck, torso, and extremities. Grace's arm was also broken. Autopsy timing of the break was placed as likely having occurred several weeks prior to Grace's death. Fingernail scratches of recent origin were identified on Grace's arm, as were scars on Grace's abdomen and lower back.

The personal representative for Grace's estate sued Bogey and her father, a number of Department employees – Perez, Villareal, Bowman, Holmes, Saenez, Encinias, Karen Zarate, and Bonnie Vehstedt – and the Department itself.[2] He claimed that the defendants violated the New Mexico Torts Claims Act ("NMTCA") and the federal Adoption Assistance and Child Welfare Act

---

[2] Although it is not in the record, at oral argument it was revealed that Johnson's status as personal representative has been the subject of much litigation. He was appointed by a state court on the request of an attorney for Grace's birth mother, Lorena Torrez, and Lorena Torrez's children, who now represents Johnson before this court. The propriety of appointing Johnson as personal representative is on appeal in state court. Torrez and Torrez's children are also attempting to recover from Grace's estate in parallel litigation in state court.

("AACWA"). He also filed a claim under § 1983 for violations of the substantive component of the Due Process Clause against the Department employees and the Bogeys.

In response to a 12(b)(6) motion, the district court dismissed the NMTCA and AACWA claims against all defendants. The district court also dismissed the § 1983 claims against Bogey and her father because they were not state actors. It declined to exercise supplemental jurisdiction over the state law claims against the Bogeys.

The district court then granted summary judgment on the § 1983 claims for Bowman, Encinias, Narvaez, Saenz, Vehstedt, Villareal, and Zarate on qualified immunity grounds. Claims against Holmes and Perez, however, proceeded to trial, and a jury returned a verdict in their favor.

The personal representative now appeals, arguing that the district court (1) improperly dismissed on the pleadings the claims brought under the NMTCA; (2) utilized improper jury instructions for the trial of Perez and Holmes; and (3) improperly granted summary judgment to Bowman and Villareal.

**II**

Below, the state tort claims against the Department, a New Mexico state agency, and the Department employees were dismissed because the defendants were protected by sovereign immunity. This determination was erroneous, the personal representative argues, because the "building waiver" clause in the

NMTCA expressly waives sovereign immunity in these circumstances. He is mistaken. Because New Mexico does not have a duty to engage in the day-to-day "operation" of Bogey's house or the provision of care to Grace, the "buildings waiver" does not apply. Sovereign immunity thus bars the personal representative's state tort law claims against the Department and the individual defendants.

We review a district court's grant of a motion to dismiss de novo. Sutton v. Utah State Sch. For Deaf and Blind, 173 F.3d 1226, 1236 (10th Cir. 1999). The New Mexico Tort Claims Act does not provide a cause of action for all negligent behavior engaged in by State employees. Instead, it seeks to balance the need to limit governmental liability and the desire to compensate those injured by the negligence of State employees by creating a general immunity from tort liability for the State and State employees with certain, limited exceptions. Cobos v. Dona Ana County Hous. Auth., 970 P.2d 1143, 1145 (N.M. 1998).

> One exception is the so-called "building waiver" exception, which states. The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 does not apply to liability for damages resulting from bodily injury, wrongful death or property damage caused by the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any building, public park, machinery, equipment or furnishings.

N.M. Stat. Ann. § 41-4-6 (emphasis added).

- 12 -

Because the Department had the responsibility to provide oversight over Grace's care by Bogey, it is urged, the State had responsibility to maintain and operate Bogey's home. The New Mexico Supreme Court has interpreted the phrase "operation and maintenance" in § 41-4-6 somewhat broadly; it is not "limited [in] its applicability strictly to defects in the physical building." Upton v. Clovis Mun. Sch. Dist., 115 P.3d 795, 797 (N.M. Ct. App. 2005). Nor is it limited to buildings owned by the government. Cobos, 970 P.2d at 1146-47. Instead, courts must examine the "scope of the duties" performed by public employees to operate or maintain the building in question. Id. When public employees have a duty to operate or maintain a structure, the state is liable if the negligent actions of the public employees pose a danger to the "general public." Espinoza v. Town of Taos, 905 P.2d 718, 721 (N.M. 1995). However, claims based on a public employee's duty to inspect and supervise do not fall within the "building waiver" exception. Cobos, 970 P.2d at 1149.

This is not an issue of first impression; New Mexico courts have considered similar facts twice before. In M.D.R. v. State ex rel. Human Servs. Dep't, 836 P.2d 106, 109 (N.M. Ct. App. 1992), the New Mexico Court of Appeals held the Department did not "operate" a foster home under the NMTCA by virtue of placing a child in the home. Judge Mizner wrote a concurring opinion noting that, although the Department did not operate the foster home by making the placement decision, under some circumstances the Department could "operate" a

foster home because it engages in extensive "supervision of actual day-to-day operation." Id. at 111.[3]

In Young v. Van Duyne, 92 P.3d 1269 (N.M. Ct. App. 2004), the Court of Appeals seized upon this distinction made in Judge Mizner's concurrence. It held that the "building waiver" exception applied when the state placed an extremely violent young man in a foster home and the young man killed one of the foster parents. The court found that the waiver applied because the state's extensive role in regulating foster homes amounted to "control over the . . . home as a licensed foster home." Id. at 1276. The holding in Young rested on the extensive role the state plays in regulating and operating foster homes.

Before us, the personal representative's claim that the Department operated and maintained Bogey's home takes two forms. First, he argues that the State's regulation of adoptive homes before the adoption is final is akin to the State's regulation of foster homes, and that, therefore, Young applies. This argument is flawed because the State's treatment of adoptive homes is substantially different from its treatment of foster homes. Under the NMTCA, foster parents are "public employees," and hence the "operation" of their home is by the State. N.M. Stat. Ann. § 41-4-3(F)(4). New Mexico regulations make clear that, although foster parents are private citizens, they play a public role when they take in foster

---

[3] Judge Mizner's concurring opinion did not have any binding precedential effect. However, the New Mexico Court of Appeals has since relied on its reasoning.

children.[4] "The foster parent is a member of the child's case management team and, as a team member, participates in the development and implementation of team plans and may participate in conferences, citizen review boards, judicial reviews, individual education plans, etc. Foster parents do not make independent plans for children in their care." N.M. Admin. Code § 8.27.2.19(C) (emphasis added). Instead, "foster parents cooperate with and carry out the [Department] plans for the child." Id. Further, the State directly controls day-to-day parenting in foster homes. For instance, State regulations specifically require foster children to be assigned household chores, id. § 8.27.3.22, and foster parents are forbidden from making negative comments about the foster children's birth parents. N.M. Admin. Code § 8.27.3.25. New Mexico regulations also specifically regulate the buildings in which foster parents live. See id. §§ 8.27.2.15; 8.27.3.11; N.M. Stat. Ann. § 40-7a-4(D).

There are no similar regulations of putative parents before adoptions are made final. Adoptive parents are investigated by the State and their progress is monitored by the State, but they are not considered public employees nor is their day-to-day conduct as parents regulated and controlled by the State. In light of

---

[4] State regulations suggest that foster parents are effectively state officials, at least for some purposes. Foster parents are screened, trained, studied, approved and licensed by the state. N.M. Admin. Code § 8.27.2.13. See also N.M. Stat. Ann. §§ 32(A)-1-4(G); 40-7A-4(B). Licenses must be renewed each year and applicants must meet stringent and extensive requirements for serving as a foster parent as well as undergoing annual training. N.M. Admin. Code § 8.27.2.13; see also N.M. Admin. Code §§ 8.27.2.19; 8.27.3.12.

the highly unusual facts of Young and the tension between its analysis and that in M.D.R., we are not persuaded that New Mexico precedent treats everything that happens within a foster home as within the building waiver exception. But even accepting that premise for sake of argument, we conclude that the reasoning of Young does not extend to adoptive homes. The State does not play anywhere near as extensive a role in adoptive homes as it does in foster homes.

Secondly, the personal representative argues that the Department failed to sufficiently investigate and report the allegation of child abuse. The Department does have a duty to investigate and report on whether there has been successful integration of the family, whether there were needs for social services, and whether there were instances of child abuse. This, however, is not "day-to-day operation" of the home. New Mexico courts have been clear that a duty to regulate and investigate violations does not constitute "operation" of a facility under the NMTCA. See, e.g., Caillouette v. Hercules, Inc., 827 P.2d 1306, 1312-13 (N.M. Ct. App. 1992) (holding that the State did not "operate" within the meaning of the NMTCA a truck containing explosives that was inspected by state police officer following a crash because "the use of the words 'operation' and 'maintenance' . . . indicates an intent not to extend liability to all activities supervised or inspected by the state."); Owens v. Leavitts Freight Serv., Inc., 745 P.2d 1165, 1168 (N.M. Ct. App. 1987) ("The design, planning and enforcement of safety rules for school bus transportation do not fall within the meaning of

- 16 -

'operation' of a motor vehicle."); cf. Cobos, 970 P.2d at 1149 (finding the State did operate a private building used as a housing project because the "Defendants' duties in this case do not arise as a consequence of the general regulatory relationship between the government and its citizens.").

Neither the Department nor its employees "operated" Bogey's home and they are therefore protected by sovereign immunity against the personal representative's tort claims. Dismissal of these claims should be affirmed.

**III**

The personal representative also appeals the jury's verdict that Holmes and Perez did not violate Grace's rights under the substantive component of the Due Process Clause. He claims that the jury instructions for their trial misstated the applicable law by requiring the jury to find that their actions "shocked the conscience." Therefore, the personal representative claims, the jury's verdict should be reversed. This claim is meritless; the jury instructions were a correct statement of applicable law.

Because the personal representative failed to object to the jury instructions at trial, we review only for plain error. Greene v. Safeway Stores, Inc., 210 F.3d 1237, 1245 (10th Cir. 2000). "Under that standard, we will affirm unless the instructions were 'patently, plainly erroneous and prejudicial.'" Id. (quoting Unit Drilling Co. v. Enron Oil & Gas Co., 108 F.3d 1186, 1190 (10th Cir. 1997)).

The § 1983 claims against Holmes and Perez allege violations of Grace's substantive due process rights under the Fourteenth Amendment. Generally, state actors are liable under the Due Process Clause only for their own actions and not the actions of private citizens. Ulhrig v. Harder, 64 F.3d 567, 572 (10th Cir. 1995). There are two exceptions to this rule. State officials may be subject to constitutional liability if they: (1) create a danger that results in a harm to an individual, even if that harm is not ultimately inflicted by a state official; or (2) if the state has a "special relationship" with the individual who is harmed by the third party. Id. Both the "danger creation" and the "special relationship" theories of liability were advanced at trial. The district court instructed the jury that the personal representative was required to prove that the defendants' conduct "shocked the conscience" to recover under either theory.

On appeal, the personal representative argues that a "shocks the conscience" test only applies to "danger creation" claims and does not apply to "special relationship" claims. This argument is directly precluded by our precedent. In Radecki v. Barela, we held:

> It is true, of course, that state actors are generally only liable under the Due Process Clause for their own acts and not private violence. There are, however, two exceptions to that rule. First, the state may be subject to constitutional liability if it does not perform a duty to provide protection to an individual with whom the state has a special relationship because it has assumed control over that individual, such as in a prison. Second, the state may be constitutionally liable if it creates a danger that results in harm to an individual, even if that

- 18 -

harm is ultimately inflicted by a private party. <u>The shocks the conscience standard applies to both types of suits.</u>

146 F.3d 1227, 1230 (10th Cir. 1998) (internal citations and quotation marks omitted) (emphasis added).  The jury instruction correctly stated the law and there is no reason to reverse the jury verdicts in favor of Holmes and Perez.

**IV**

Appeal of the district court's grant of summary judgment favoring Villareal and Bowman on qualified immunity grounds is predicated on the claim that the district court improperly resolved factual disputes and improperly drew inferences in favor of Bowman and Villareal.  The undisputed facts show that Bowman exercised her professional judgment in her investigation of abuse allegations and, thus, did not violate Grace's substantive due process rights.  There are, however, genuine issues of material fact as to whether Villareal exercised her professional judgment by failing to investigate several suspicious events during the period she was the Department employee directly responsible for Grace.  Hence, we affirm the grant of summary judgment for Bowman, but reverse the grant of summary judgment for Villareal.

We review a grant of summary judgment on the basis of qualified immunity de novo.  <u>Jiron v. City of Lakewood</u>, 392 F.3d 410, 413-14 (10th Cir. 2004).  Summary judgment is appropriate if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and one party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). We must construe the record in the light most favorable to the non-moving party. Id.

In order to defeat a qualified immunity defense, "a plaintiff must show that (1) the official violated a constitutional or statutory right; and (2) the constitutional or statutory right was clearly established when the alleged violation occurred." Mimics, Inc. v. Village of Angel Fire, 394 F.3d 836, 841 (10th Cir. 2005) (internal citations and quotation marks omitted). "We must first determine if a constitutional right was violated because in the course of determining whether a constitutional right was violated on the premises alleged, a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established." Harman v. Pollock, 446 F.3d 1069, 1077 (10th Cir. 2006) (internal quotation marks omitted). In this case, the parties agree that the allegations are based on clearly established law. Thus, the only question for us to decide is whether there is a genuine question of material fact as to whether Bowman or Villareal violated Grace's substantive due process rights.

As noted above, state officials are generally not responsible for the actions of third parties under the substantive component of the Due Process Clause. DeShaney v. Winnebago County Dept. of Social Servs., 489 U.S. 189, 201 (1989). They, however, can be held liable for harm done by third parties if the state has a

"special relationship" with the harmed individual. A "special relationship . . . exists when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual . . . ." Id. at 199-200. In Yvonne L. v. New Mexico Dep't of Human Serv., 959 F.2d 883 (10th Cir. 1992), we held that the state has a special relationship with children in state custody. If the state or its employees "knew of the asserted danger to [minor children in state custody] or failed to exercise professional judgment with respect thereto . . . and if an affirmative link to the injuries [the children] suffered can be shown, then [the state or its employees] violated plaintiffs' constitutional rights." Id. at 890. We noted that the standard used in Yvonne L., "failure to exercise professional judgment," requires more than mere negligence: it requires an abdication of professional responsibility. Id. at 894. Such abdication must be sufficient to shock the conscience. Cf. Radecki, 146 F.3d at 1230. Both Bowman and Villareal concede that the state had a special relationship with Grace, but argue that their conduct did not violate the Fourteenth Amendment.

Bowman

Two bases are advanced in support of the contention that summary judgment should not be granted to Bowman. First, the personal representative argues that a genuine question of material fact exists as to whether the investigation of the abuse allegation violated Grace's rights, given the delay in initiating the investigation and the decision by Perez to notify Bogey in advance

that an investigator was coming.  Second, he claims that a genuine dispute of material facts exists as to whether Bowman employed professional judgment in conducting her investigation because Bowman reported that there was no evidence that Grace had been abused, despite evidence indicating otherwise, and did not contact any third parties after meeting with Bogey to discuss the abuse allegations.

Regarding the first contention, there is no evidence that Bowman was responsible for the delay in the investigation.  Perez and Holmes were the officials responsible and the personal representative's claims against them went to trial.  Further, it was Perez who notified Bogey about the abuse allegations.  This contention – that the delay and early notification of Bogey by Perez and Holmes may form the basis of a claim that Bowman violated Grace's Fourteenth Amendment rights – was properly rejected.

As for the second contention, our review of the record reveals that there are no disputed questions of material fact.  There is clear, uncontradicted evidence that Bowman thoroughly examined Grace's body during her visit to Bogey's home and, in her professional judgment, determined there was no abuse.  No facts were advanced that contradict this clear evidence.  Instead, the personal representative attempts to indict Bowman's judgment by noting that Nurse Lagestam found intentionally-inflicted fingernails scratches on Grace's neck, back, and abdomen during her examination of Grace that Bowman did not find.

He also claims that the autopsy revealed that fingernail scratches on Grace's back and neck were apparent when Bowman performed her examination. However, the autopsy states that the scratches were "consistent with recent injury," and the autopsy took place months after Bowman's investigation. Because the autopsy report does not show what the personal representative claims it does, there remains no evidence that Bowman missed something in her investigation; Nurse Lagestam determined Grace had been abused weeks before Bowman conducted her examination. This claim thus distills to the assertion Lagestam found evidence of abuse and Bowman did not. That two professionals both conducted an investigation and simply disagreed about a diagnosis is not proof, in and of itself, that either professional has abandoned her professional judgment.

It is clearly correct that Bowman failed to call Nurse Lagestam or any other third party following her investigation. But no evidence is advanced that establishes that failing to do so is "such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." Youngberg v. Romero, 457 U.S. 307, 323 (1982). In order to create a question of material fact as to whether Bowman's decision not to call a secondary source violated the Fourteenth Amendment, the personal representative must establish that this failure was a substantial departure from accepted professional judgment, practice, or standards. The only evidence the personal representative points to is a report

by Alvin Sallee, an expert witness, who expressed an opinion that the Department's behavior as a whole during the investigation, including Bowman's failure to call a third party, was grossly negligent. Given the deferential standard of review we employ under Youngberg, this does not provide the type of particularized evidence necessary to create a dispute of material fact as to whether the failure to contact outside sources was an impermissible deviation from professional judgment.[5] Summary judgment as to this defendant was thus proper.

Villareal

Under a "special relationship" theory, the personal representative argues that Villareal violated Grace's substantive due process rights by failing to exercise professional judgment in: (1) deciding to place Grace in Bogey's home; (2) loosely supervising Perez when she was the social worker assigned to Grace's case; and (3) failing to investigate the arrival of Bogey's father, Terry Bogey, and the decision by Bogey to withdraw Grace from all contact with the outside world when she was the social worker with sole responsibility for Grace's case.

There is no merit to the claims relating to the placement decision or Villareal's oversight of Perez. Villareal did not decide to place Grace with Bogey on her own: she acted on the advice of the Department's adoption consultant,

---

[5] Further, Bowman explained that her failure to make the calls was a result of a staffing problem at the Department. A failure to satisfy professional standards can be excused, under certain circumstances, because of budgetary constraints. Youngberg, 457 U.S. at 323. Because there is no evidence that her conduct fell below professional standards, we need not address this argument.

Viviane Encinias, and as part of a Department committee. Only two Department employees expressed any doubts about Bogey's fitness as an adoptive parent: Perez and Holmes both noted that they were somewhat worried that Bogey, as a single mother, might have trouble meeting Grace's needs. That Villareal, along with others at the Department, decided to go ahead and place Grace with Bogey in the face of such mild doubts does not constitute a failure to exercise professional judgement. Further, the personal representative's claim that Villareal violated Grace's constitutional rights by improperly supervising Sonia Perez is precluded by the jury's finding that Perez did not violate Grace's constitutional rights. Jiron, 392 F.3d at 419 (holding that a finding that an officer did not violate a plaintiff's constitutional rights meant that the officer's supervisor could not be held liable for deficient supervision).

However, there is merit to the personal representative's argument that there are disputed questions of fact as to whether Villareal exercised her professional judgment after Perez left the Department. After Perez resigned, Villareal was solely responsible for Grace's case. During this period, Bogey removed Grace from day care and fired her home health nurses. Then, Terry Bogey moved in to Bogey's home, and Bogey did not inform the Department. Villareal did not investigate any of these circumstances and, over a two-month span, did not make a single visit to Bogey's house or inquire into these matters. According to the personal representative's expert witness, Sallee, this was an abandonment of

professional judgment.  Whether Villareal exercised professional judgment in concluding that the events were not of concern is a disputed question of material fact and is inappropriate for resolution on summary judgment.

Villareal argues that extreme short-staffing at the Department is the cause of any failures on her part during this period.  Undisputed testimony shows that Villareal was both covering the large number of cases Perez left behind and serving as a supervisor to other social workers.  The Supreme Court has stated that, "[i]n an action for damages against a professional in his individual capacity, however, the professional will not be liable if he was unable to satisfy his normal professional standards because of budgetary constraints; in such a situation, good-faith immunity would bar liability."  Youngberg, 457 U.S. at 323.  However, Villareal does not present evidence that budgetary problems at the Department caused her complete failure to investigate.  Existence of budgetary problems is not an automatic free pass for unprofessional behavior, and the record is not clear about whether Villareal's workload, and not some less benign explanation, made her unable to investigate the questionable situation in Bogey's home.  Summary judgment on this issue was therefore inappropriate.[6]

---

[6] A substantive due process claim rooted in a "danger creation" theory is also advanced on appeal.  The "danger creation" theory is another exception to the rule from DeShaney that state officials cannot be held responsible under the substantive due process clause for the actions of third parties.  Liebson v. New Mexico Corrections Dep't, 73 F.3d 274, 276 (10th Cir. 1996).  "[A] state may also be liable for an individual's safety if it created the danger that harmed the

(continued...)

**IV**

We **AFFIRM** the district court's dismissal of the state tort claims against

the Department and Department employees on sovereign immunity grounds.

Further, we **AFFIRM** the jury verdicts in favor of Holmes and Perez and the

---

[6](...continued)
individual.  Id.  In Currier v. Doran, 242 F.3d 905, 919 (10th Cir. 2001), we applied the "danger creation" doctrine to child placements by the very agency involved in this case, the Children, Youth and Families Department.  We held that Department officials can be held responsible under the substantive component of the Due Process Clause for creating danger to children by engaging in such reckless conscious disregard for risk when placing them in a home that it shocks the conscience.  To establish liability under a "danger creation" theory, a plaintiff must prove that "(1) the charged state entity and the charged individual actors created the danger or increased plaintiff's vulnerability to the danger in some way; (2) plaintiff was a member of a limited and specifically definable group; (3) defendant's conduct put plaintiff at substantial risk of serious, immediate, and proximate harm; (4) the risk was obvious or known; (5) defendant acted recklessly in conscious disregard of that risk; and (6) such conduct, when viewed in total, is conscience shocking."  Id. at 918.  In Currier, a Department official failed to investigate numerous allegations of severe abuse before placement and we held that the failure to do so could meet these requirements and thereby violate a child's substantive due process rights.  Id. at 924.

The "danger creation" claim in this case does not meet the requirements laid out in Currier.  The personal representative argues that Villareal failed to properly investigate Bogey before recommending to the Children's Court that the adoption be finalized, and thereby created the danger that led to Grace's death.  However, there is no allegation that the risk of abuse to Grace was obvious or known, as is required for a danger creation claim, because it is undisputed that Villareal relied upon Bowman's determination that the abuse allegation was unsubstantiated.  Without proving the existence of a "obvious or known" risk, such as the uninvestigated abuse allegation in Currier, a danger creation claim cannot survive.  Therefore, the district court rightly granted summary judgment as to this claim.

- 27 -

grant of summary judgment to Bowman.  However, the grant of summary judgment to Villareal was improper because there are disputed questions of material fact relating to the period in which she was the Department employee directly responsible for Grace prior to the adoption.  With respect to that claim only, we **REVERSE** the district court and **REMAND** for further proceedings consistent with this opinion.