# Third District Court of Appeal

## State of Florida

Opinion filed February 24, 2016.
Not final until disposition of timely filed motion for rehearing.

_____

Nos. 3D15-1293, 3D15-1204, 3D15-1153, 3D15-1105, & 3D15-1104
Lower Tribunal Nos. 14-21291 & 14-23724

_____

**Lacheryl Harris, et al.,**
Appellants,

vs.

**G.K., a minor, etc., et al.,**
Appellees.

Appeals from non-final orders from the Circuit Court for Miami-Dade County, Jorge E. Cueto, Judge.

Laufer & Laufer and Alicia Lyons Laufer (Boca Raton); Vernis & Bowling of Palm Beach and Karen M. Nissen and Ashley N. Landrum (North Palm Beach); Anthony & Associates and Andrew J. Anthony and Bradley A. Silverman; Marrero & Wydler and Oscar E. Marrero, Lourdes Espino Wydler and Alexandra C. Hayes, for appellants.

Grossman Roth and Neal A. Roth and Rachel W. Furst, for appellees.

Before SALTER, FERNANDEZ and LOGUE, JJ.

SALTER, J.

Lacheryl Harris, Jean Lacroix, and Eunice Guillot appeal orders denying their motions to dismiss complaints brought against them under 42 U.S.C. § 1983 on behalf of two minors, appellees G.K. and J.B.[1] The motions to dismiss were based on claims of qualified or quasi-judicial immunity "in a civil rights claim arising under federal law," such that the orders denying the motions are appealable non-final orders under Florida Rule of Appellate Procedure 9.130(a)(3)(C)(vii).

Harris, Lacroix, and Guillot were employees of the Florida Department of Children and Families (DCF) at the time of the various alleged acts and omissions detailed in the complaints. DCF itself was also named as a defendant in the complaints filed by G.K. and J.B., and remains so, in the circuit court cases.

We affirm the denial order regarding J.B.'s claims against Lacroix (Case No. 3D15-1105), but we reverse and remand as to the order denying Guillot's motion to dismiss J.B.'s claims on grounds of qualified immunity (Case No. 3D15-1153). We reverse and remand as to each of the orders denying the motions to dismiss the claims brought by G.K. against Harris (Case No. 3D15-1293), Lacroix (Case No. 3D15-1204), and Guillot (Case No. 3D15-1104).

Facts and Procedural History

[1] Each appellant filed a separate appeal as to each of the two circuit court cases brought in the circuit court by G.K. and J.B. One of the six appeals was voluntarily dismissed (Harris v. J.B., Case No. 3D15-1184); the remaining five were separately briefed but consolidated for oral argument. In view of the overlapping issues and record, on our own motion we extend the consolidation to address all five appeals in this opinion.

2

The plaintiffs below, G.K. (born in 1999) and J.B. (born in 2003), were siblings who were allegedly subjected to horrific emotional and physical abuse by their foster (and ultimately, adoptive) parents, Jorge and Carmen Barahona. The Barahonas adopted G.K. in 2001 and J.B. in 2007. Twins N.B. and V.B. were also placed in foster care with the Barahonas in 2004, at age three. N.B. and V.B. were adopted by the Barahonas in 2009.

G.K.'s complaint alleged that Harris was a family services counselor for DCF and was "assigned to children" in the Barahonas' home, and that Lacroix and Guillot were child protective investigators employed by DCF who investigated allegations regarding abuse and neglect by the Barahonas. G.K. claimed that DCF and its three individual employees received information (at different times, and received by different employees among the three of them, from incident to incident) from a school nurse, psychologists, Mrs. Barahona, school teachers and counselors, a school principal, and DCF's abuse hotline, regarding N.B. and V.B.

As a result of the alleged failure of the employees to properly investigate and follow up on the numerous reports and observations, G.K.'s complaint claims that the employees missed obvious and protracted abuse by the Barahonas of the children in their home, including G.K. Each of the enumerated incidents and failures to investigate and report, however, occurred after the Barahonas had adopted G.K.

3

In February 2011, despite alleged calls to the DCF abuse hotline regarding the Barahonas' abuse of N.B. and V.B., the reports were misclassified as non-urgent. Days later, N.B.'s body was discovered in the back of Jorge Barahona's truck. V.B. was also in the truck with severe, life-threatening injuries.

J.B.'s complaint was nearly identical to the complaint filed by G.K. J.B. was adopted in 2007, however, and the allegations relating to failures by Harris and Lacroix to investigate and report abuse in the home included incidents which occurred before the adoption. The allegations relating to Guillot involved incidents which occurred after J.B. was adopted by the Barahonas.

The individual defendants filed motions to dismiss or strike the complaints asserting that they owed G.K. and J.B. no legal duty, that they were entitled to qualified or quasi-judicial immunity, and that the complaints failed to state a cause of action under 42 U.S.C. § 1983. The trial court consolidated the motions for hearing and ultimately denied all of the motions. These appeals followed. DCF did not file a separate dismissal motion in the trial court but has filed briefs in support of Harris, Lacroix, and Guillot in these appeals.

Standard of Review

In reviewing the orders denying the motions to dismiss, we assume the truth of all the facts alleged in the complaint, and we draw all inferences from those facts in the light most favorable to the plaintiffs. Cortez v. Palace Resorts, Inc.,

123 So. 3d 1085, 1088 n.2 (Fla. 2013). Federal courts evaluating claims under § 1983 apply a similar standard: "the allegations in the complaint must be taken as true and construed in the light most favorable to the child." Taylor By & Through Walker v. Ledbetter, 818 F.2d 791, 793 (11th Cir. 1987).

Analysis

Qualified immunity shields a government actor from personal liability when his conduct does not violate clearly established rights. See Anderson v. Creighton, 483 U.S. 635, 638, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987). A two-part test is used to determine whether qualified immunity applies. First, the defendant must show that he performed the acts as part of a discretionary government function. See Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). The burden then shifts to the plaintiff to prove that the defendant's conduct violated clearly established statutory or constitutional rights. Harlow, 457 U.S. at 818, 102 S. Ct. 2727.

Becker v. Clark, 722 So. 2d 232, 233 (Fla. 2d DCA 1998).

In the case of G.K., dismissal based on qualified immunity was appropriate because G.K. had already been adopted by the Barahonas at the time information regarding alleged abuse was allegedly received by the defendants regarding N.B. and V.B. Foster children have a "substantive-due-process right to be free from abuse," such that "an individual state employee has a constitutional duty to protect a foster child from a substantial risk of serious harm at the hands of others." L.T. v. Mandrell, No. 4:08CV332-RH/WCS, 2009 WL 1971632, at *3 (N.D. Fla. July 8, 2009). Individual liability in such cases must be based on intentional violations of, or deliberate indifference to, the clearly established rights of the foster child.

5

Mere negligence or carelessness does not establish personal liability as to the individual state employee. Id.; see also Ray v. Foltz, 370 F.3d 1079 (11th Cir. 2004).

Although G.K.'s complaint contained the requisite allegations of intentional violations and deliberate indifference, the underlying acts and omissions all occurred after G.K.'s adoption. J.B.'s complaint also alleged intentional violations and deliberate indifference, but the underlying acts and omissions alleged as to Guillot occurred after J.B.'s adoption.

Florida law has not, to this point at least, imposed the same or similar legal duties on state employees with respect to natural or adoptive children who live in a home with foster children when reports of abuse are received regarding the foster children. The natural or adoptive parents have the legal duties to protect and support the natural or adoptive children, while the state agency and its employees have the duty to protect the foster children from a substantial risk of harm from others (including the foster parents). "The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 200 (1989). DCF and its employees do not restrict the freedom of

6

natural or adoptive children after adoption as DCF and its employees are empowered to do in the case of foster children.

G.K. and J.B. nevertheless argue that they were continuously in a "special relationship" with DCF and its employees (because of the foster children in the same home), such that they should also have been protected from harm by the employees. G.K.'s and J.B.'s briefs rely on cases from outside Florida for this argument:

> In Taylor, the Eleventh Circuit reasoned that a child in a foster home is in a "special relationship" with the state because he "is in a situation so analogous to a prisoner in a penal institution and a child confined to a mental health facility." Id. at 797. And courts beyond the Eleventh Circuit have already acknowledged that a child not in state custody can have a special relationship with the state. In Hayes v. Erie County Office of Children and Youth, 497 F. Supp. 2d 684, 695 (W.D. Pa. 2007), for example, the district court recognized that a "sufficiently analogous" custodial relationship between a state and an adopted child would be sufficient to "make out a 'special relationship' claim." In that case, the court acknowledged that "[t]here may be cases where a child welfare agency has on-going involvement with a child in an adoption setting such that it acquires a constitutional duty to protect the child from harm occurring during the pendency of, or soon after, adoption proceedings." Id. Similarly, in a case before the Tenth Circuit Court of Appeals, Johnson ex rel. Estate of Cano v. Holmes, 455 F.3d 1133, 1143 (10th Cir. 2006), the state conceded that it had a "special relationship" with an adopted child and that the only issue was whether the evidence supported a finding that the social workers violated the child's rights in the post-adoptive period.

These cases are inapplicable to the allegations before us. First, the state employees did not receive allegations of abuse relating to G.K. or J.B.; they

received and investigated allegations that pertained to the foster children in the home.

Second, the cases relied upon by G.K. and J.B. are based on theories that have not been approved by courts in Florida or by the United States Court of Appeals for the Eleventh Circuit as to § 1983 claims brought by natural or adoptive children. In the first of the two cases relied upon by G.K. and J.B., <u>Hayes v. Erie County Office of Children & Youth</u>, 497 F. Supp. 2d 684 (W.D. Pa. 2007), a mentally disabled 15 year-old girl was killed by her adoptive mother two or three years after the adoption was finalized. The Erie County, Pennsylvania, Office of Children & Youth (OCY, performing functions substantially similar to those performed by DCF in Florida) received at least ten contacts reporting suspected physical abuse of the adopted child during the 13 months preceding her death.

The plaintiffs in <u>Hayes</u> sought to demonstrate a "special relationship" between the decedent and the OCY employees as one element of the "state-created danger" theory of liability adopted by the United States Court of Appeals for the Third Circuit in 1996.[2] That theory, however, requires three additional elements and has not been expressly adopted in Florida or the Eleventh Circuit with respect to natural or adoptive children.[3] Finally, the court in <u>Hayes</u> dismissed the

---

[2] <u>Kneipp v. Tedder</u>, 95 F.3d 1199 (3d Cir. 1996).

[3] <u>See</u> <u>Milanese v. City of Boca Raton</u>, 84 So. 3d 339 (Fla. 4th DCA 2012); <u>Waddell v. Hendry Cty. Sheriff's Office</u>, 329 F.3d 1300, 1305 (11th Cir. 2003)

8

plaintiff's claim under § 1983 "insofar as said claim is premised upon a 'special relationship theory.'" Hayes, 497 F. Supp. 2d at 708.

In the second case relied upon by G.K. and J.B., Johnson ex rel. Estate of Cano v. Holmes, 455 F.3d 1133 (10th Cir. 2006), a foster child born with spina bifida was adopted soon after her first birthday. The foster family had objected to the adoption because "they thought that [the adoptive mother] was actually a man pretending to be a woman because of [the adoptive mother's] extensive facial hair." Id. at 1135. The adoptive mother's father, "a self-described hermaphrodite who claims also to be [the adoptive mother's] mother—then moved in." Id. The New Mexico Children, Youth, and Families Department monitored the pre-adoptive placement and considered numerous reports indicating potential physical abuse before the adoption was approved. A month after the adoption, the child died. Her autopsy revealed that she "died of craniocerebral blunt force, and noted that there was evidence of serious injuries to [the child's] head, neck, torso, and extremities. [The child's] arm was also broken." Id. at 1138.

Johnson thus involves pre-adoption reports and inaction occurring before the adoption. The case also involves complaints of physical abuse regarding the

---

(holding that the "special relationship" and "special danger" doctrines were superseded by the Supreme Court of the United States in Collins v. City of Harker Heights, Texas, 503 U.S. 115 (1992), and warning that "[d]eterminations of what is egregious conduct must not be made in the glow of hindsight").

9

decedent rather than reports relating to another foster child in the adoptive parent's home.

J.B. was not adopted until 2007, after Lacroix had allegedly received reports of abuse in the home, but before Guillot had received any such information. And again, J.B.'s allegations involve a failure to act on reports of abuse pertaining to N.B. and V.B., not J.B. herself.

We decline to apply the holdings in <u>Hayes</u> or <u>Johnson</u> to either complaint as to the employees who had no pre-adoption contact with G.K. or J.B. We find that J.B.'s claim against Lacroix, who did have pre-adoption contact with J.B. and allegedly received reports of possible abuse in the home, is legally sufficient under § 1983, and that those claims are not barred at the pleadings stage by virtue of qualified immunity.[4] For the sake of clarity:

- In all three appeals relating to G.K. (Case No. 3D15-1293, Harris; Case No. 3D15-1204, Lacroix; and Case No. 3D15-1104, Guillot), we reverse the order denying those individual defendants' motions to dismiss, and we remand with instructions to grant the motions to dismiss as to those three defendants.

---

[4]  Harris also had pre-adoption contact with J.B., but we do not address the allegations or legal sufficiency of the complaint as to her because of the voluntary dismissal of her appeal before briefing and argument.

- In the two remaining appeals relating to J.B. (Case No. 3D15-1105, Lacroix; and Case No. 3D15-1153, Guillot), we affirm the order denying Lacroix's motion to dismiss, we reverse the order denying Guillot's motion to dismiss, and we remand with instructions to grant Guillot's motion to dismiss the complaint.

Affirmed in part, reversed in part, and remanded with instructions.