FILED
United States Court of Appeals
Tenth Circuit

July 31, 2014

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

THE ESTATE OF B.I.C., a minor child, deceased,

      Plaintiff - Appellant,

and

LARRY F. CROSETTO, individually and as next friend of C.S.C., a minor child; MARY LOU CROSETTO,

      Plaintiffs,
v.

LINDA GILLEN, individually and as an agent of the Kansas Social and Rehabilitation Services,

      Defendant - Appellee.

No.  13-3232

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 6:10-CV-01017-MLB-KGG)**

---

Randall K. Rathbun (Molly M. Gordon, with him on the briefs), Depew Gillen Rathbun & McInteer, LC, Wichita, Kansas, for Plaintiff - Appellant.

Gerald L. Green, Gilliland & Hayes, LLC, Hutchinson, Kansas, for Defendant - Appellee.

Before **LUCERO**, **HARTZ**, and **HOLMES**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

---

Brooklyn Coons (called "Brook" by her estate) died from being shaken and possibly struck on the head while in the care of her father's girlfriend. Her estate, the remaining plaintiff in this case, alleges that Defendant Linda Gillen, a social worker, knew that Brook was in danger and subject to abuse but did not respond to reports of the abuse, increasing Brook's vulnerability to danger. The estate sued Defendant under 42 U.S.C. § 1983 for violating Brook's right to substantive due process. The district court granted Defendant summary judgment, holding that she was entitled to qualified immunity because she did not take any affirmative action that increased the child's vulnerability to danger and because there was no clearly established law that her alleged conduct violated Brook's due-process rights. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm because Defendant's conduct was not a violation of clearly established law.

## I. BACKGROUND

On review of a summary judgment, we set forth the evidence in the light most favorable to the nonmoving party, here the estate. *Estate of B.I.C. v. Gillen* (Estate of B.I.C. I), 710 F.3d 1168, 1171 (10th Cir. 2013). Brook died at the age of 23 months. Her parents were Angela and Randy Coons. Brook, her brother C.S.C., and her mother lived with Brook's maternal grandparents, Larry and Mary Crosetto, after her mother left

Mr. Coons in 2006. When Angela died on August 9, 2007, Mr. Coons moved the children from the Crosettos' home to his, but the children still spent time with their grandparents, especially on weekends. Mr. Coons was living with his girlfriend Melissa Wells, who has been convicted of Brook's murder.

Defendant was a social worker with the Kansas Department of Social and Rehabilitative Services (SRS), where she had worked for several decades. The Crosettos allege that she developed a deep hatred of them in 1982, when they were adopting Angela.

Soon after Mr. Coons took custody of the children, the Crosettos began to see injuries to Brook. In September 2007 a babysitter for the Crosettos observed "random bruising all over [Brook's] body," a black eye, and "a busted lip with stitches." Aplt. App., Vol. II at 221. She called the SRS child-protection hotline and reported her observations along with Brook's name and birthdate and the names of Brook's father and brother. SRS states that it has no record of this call in its database and that a record would have been generated if it had received a call.

On September 17, 2007, an employee at C.S.C.'s school filled out a social-work referral form reporting the Crosettos' concerns about Brook's constant bruises and her stitched lip. On November 5, Mr. Crosetto asked the local fire chief to inspect Mr. Coons's home because of his concerns about living conditions there. The fire chief inspected the outside of the home and left a note asking for permission to inspect inside, but never received a response from Mr. Coons or Ms. Wells.

3

Also on November 5, C.S.C. came to school with a two-inch-square mark on his cheek that required icing. The school reported the incident to Defendant, who spoke with Mr. Coons and Ms. Wells. Ms. Wells admitted that she had slapped C.S.C. in anger when talking to him about fighting in school; she said, however, that she "did not think she slapped him hard enough to cause the red mark." *Id.* at 231. Although Defendant found the allegation of abuse unsubstantiated, she instituted a safety plan with the family that included discontinuing physical discipline. She did not report the incident to law enforcement, interview the Crosettos or other caretakers for the children, or complete a home visit. SRS had an August 2006 report on Ms. Wells for abuse of one of her natural children, but neither Defendant nor anyone else at SRS noted this previous incident on the report about C.S.C.

Mr. Crosetto called Defendant on November 6, 14, 15, and 16, to express concern about bruising on the children. Initially he was unable to reach Defendant and she did not return his calls. But on November 20 the two talked by phone. Defendant told Mr. Crosetto that a case had been opened and that she had been in Ms. Wells's house to investigate. Defendant now admits that she never entered the house, although she claims that she tried to visit. Also during the conversation, Defendant told Mr. Crosetto that matters of abuse were for the police and she refused to discuss them.

On December 10 Mr. Crosetto called Defendant again about bruising on Brook. She replied that "her job was to preserve the family unit and not to investigate child abuse." *Id.* at 182. On December 24 he took Brook to a pediatrician, who wrote a letter

4

to SRS and called the police as a result of bruises on Brook. The officer who responded noted that Brook "appeared to be in no distress," and he did not see "obvious signs of battery or trauma," or "anything which led [him] to believe she was in imminent danger." *Id.* at 236. He prepared a written report, sent the report to SRS, the juvenile county attorney's office, and the truancy officer, and left a phone message for Defendant. She did not get back to him. He assumed that SRS would investigate and address the matter.

On December 28 the Crosettos met with Defendant at her office by appointment. They tried to give her a CD of pictures of bruising on Brook, but she refused to take it, saying it was a police matter. The meeting became heated and Mr. Crosetto told Defendant that he did not believe she would do anything to help the children until one of them died.

On January 17, 2008, the Coffeyville Police Department went to Mr. Coons's house and found Ms. Wells with Brook, who was unresponsive. Doctors at the hospital in Tulsa, Oklahoma, found "a brain bleed from a blow to the head and brain damage resulting from Shaken Baby Syndrome." *Id.*, Vol. III at 438 (internal quotation marks omitted). Brook died from her injuries on January 20.

An investigation by the Kansas Attorney General's Office found that Defendant had handled the abuse claims about the Coons children in a much more "hands off" manner than she had handled other abuse cases. *Id.*, Vol. II at 211. It attributed this difference in treatment to "some animus or ill will toward the Crosettos." *Id.* at 211–12.

5

The Crosettos and Brook's estate filed suit under 42 U.S.C. § 1983 against Defendant in the United States District Court for the District of Kansas, claiming that she increased the danger that led to Brook's death and that she interfered with the Crosettos' familial relationship with Brook. The plaintiffs also pleaded a state-law negligence claim. Defendant moved for summary judgment on the federal claims on the ground of qualified immunity, which the district court granted, ruling that (1) the estate failed to support a danger-creation claim because Defendant's conduct did not shock the conscience, and (2) the Crosettos had not presented a viable familial-association claim. It dismissed without prejudice the state-law claim, declining to exercise supplemental jurisdiction under 28 U.S.C. § 1367. The Crosettos and the estate appealed to this court, which held that the evidence created a genuine issue of whether Defendant's conduct shocked the conscience. *See Estate of B.I.C. I*, 710 F.3d at 1174. We remanded to the district court for consideration of the elements required to establish the estate's danger-creation claim but affirmed the district court's grant of summary judgment on the Crosettos' familial-association claim. *See id.* at 1174–76. On remand the district court again granted summary judgment in favor of Defendant, ruling that she had not committed any affirmative acts that created or increased the danger to Brook, and that the estate's legal theory of danger creation was not clearly established.

On appeal the estate argues that Defendant is not entitled to qualified immunity because under clearly established law she committed sufficient affirmative acts to be liable for creating or increasing the danger to Brook. We disagree.

6

## II. DISCUSSION

Qualified immunity generally protects government officials from lawsuits unless they are "plainly incompetent" or they "knowingly violate the law." *See id.* at 1172–73 (internal quotation marks omitted). Once the defendant asserts a defense of qualified immunity, the burden is on the plaintiff to establish two propositions: (1) "that the defendant's actions violated a constitutional or statutory right," and (2) that the right was "clearly established" when the defendant acted. *Smith v. Cochran*, 339 F.3d 1205, 1211 (10th Cir. 2003) (internal quotation marks omitted). Failure to establish either one requires the court to grant judgment to the defendant. *See id.* We can begin (and perhaps end) our inquiry by addressing either proposition. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Here, we decide that the estate's theory of liability was not clearly established.

The estate asserts a claim under the Due Process Clause of the Fourteenth Amendment, which declares that a state cannot "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. In the leading case of *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), the Supreme Court addressed the extent to which the clause places a burden on the state to protect individuals from private violence. DeShaney was given custody of his infant child, Joshua, when he divorced the child's mother. *See id.* at 191. For more than two years, local social workers at the county Department of Social Services (DSS) received regular allegations of abuse, and Joshua was hospitalized at least three times for injuries

from suspected abuse. *See id.* at 192–93. On the first hospitalization a court temporarily placed Joshua in the custody of the hospital, but custody was returned to DeShaney within a few days. *See id.* at 192. Although DSS set up a protection plan, including having DeShaney's girlfriend move out and enrolling the child in preschool, the plan was not followed. *See id.* at 192–93. A DSS social worker noticed injuries on visits to the home and was told on two visits that Joshua was "too ill to see her," but she did nothing more than record these observations. *Id.* at 193. DeShaney eventually beat Joshua severely enough that he fell into a coma. *See id.* He recovered but was "expected to spend the rest of his life confined to an institution for the profoundly retarded." *Id.*

Joshua and his mother brought suit against DSS and individual DSS employees for violation of Joshua's right to substantive due process. *See id.* at 193, 195. The Supreme Court held that the defendants were entitled to judgment, stating that "[a]s a general matter . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197. "While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." *Id.* at 201. The Court noted that "[t]he most that can be said of the state functionaries in this case is that they stood by and did nothing when suspicious circumstances dictated a more active role for them." *Id.* at 203.

The Court rejected the argument that the state's duty to protect arose from a "special relationship" that "existed here because the State knew that Joshua faced a

8

special danger of abuse at his father's hands, and specifically proclaimed, by word and by deed, its intention to protect him against that danger." *Id.* at 197 (internal quotation marks omitted). It explained that the cases relied on by the plaintiffs as establishing a special relationship—cases involving prisoners and involuntarily committed mental patients—"stand only for the proposition that when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Id.* at 199–200. In those situations, wrote the Court, "[t]he affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." *Id.* at 200. It continued:

> [I]t is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the "deprivation of liberty" triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.

*Id.* The Court recognized that the plaintiffs might have a cause of action under state law, but cautioned that the Due Process Clause "does not transform every tort committed by a state actor into a constitutional violation." *Id.* at 202.

Since *DeShaney*, this court has recognized only two exceptions to the general rule that the Due Process Clause imposes no duty to protect against private violence: "when the state has assumed a special relationship with and control over an individual," as when the individual is in state custody, and when a state official "created the very danger that

9

caused the harm." *Estate of B.I.C. I*, 710 F.3d at 1173. The estate does not argue that the first exception applies, and we do not consider it. Rather, the estate relies on the danger-creation exception.

> To establish a claim under the danger-creation theory, a plaintiff must show:
>
> (1) the charged state entity and the charged individual actors created the danger or increased plaintiff's vulnerability to the danger in some way; (2) plaintiff was a member of a limited and specifically definable group; (3) defendant['s] conduct put plaintiff at substantial risk of serious, immediate, and proximate harm; (4) the risk was obvious or known; (5) defendants acted recklessly in conscious disregard of that risk; and (6) such conduct, when viewed in total, is conscience shocking.

*Id.* at 1173 (internal quotation marks omitted). There are also two "preconditions" that the plaintiff must show: that the state actor engaged in affirmative conduct and that there was private violence. *See id.* The district court ruled that the estate had not shown either the first precondition, an affirmative act on the part of Defendant, or the first element of the test, an increase in Brook's vulnerability to danger caused by Defendant.

The estate alleges six purported affirmative actions that increased Brook's vulnerability to danger: (1) Defendant refused to accept Mr. Crosetto's CD of pictures of Brook's injuries, (2) she refused to return phone calls from the police, (3) she refused to substantiate abuse that caused the large red mark on C.S.C.'s face, (4) she told Mr. Crosetto to contact the police about increased bruising on the children, (5) she told the Crosettos that any abuse of the children was not her issue, and (6) she lied about whether she had been in Ms. Wells's home to investigate the reported abuse against C.S.C.

10

The estate's burden is to show that by January 20, 2008, when Brook died, the law was clearly established that at least one of the above six actions denied Brook the right to due process. To be clearly established, the law must have been "sufficiently clear that a reasonable official would have understood that his conduct violated the right." *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001). Generally this requires "a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Id.* (internal quotation marks omitted). Although it is not necessary for the facts in the cited authority to correspond exactly to the situation the plaintiff complains of, the "plaintiff must demonstrate a substantial correspondence between the conduct in question and prior law allegedly establishing that the defendant's actions were clearly prohibited." *Trotter v. Regents*, 219 F.3d 1179, 1184 (10th Cir. 2000) (internal quotation marks omitted). The Supreme Court has "repeatedly told courts not to define clearly established law at a high level of generality since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014) (brackets, ellipses, and internal quotation marks omitted). Thus, a general statement of law—such as that a state cannot increase one's vulnerability to private violence—is not sufficient to show that the law was clearly established. *See Herring v. Keenan*, 218 F.3d 1171, 1176 (10th Cir. 2000) ("A plaintiff cannot simply identify a clearly established right in the abstract and allege that the defendant has violated it." (internal quotation marks omitted)).

11

The estate cites little authority to support the contention that it was clearly established law that Defendant's alleged conduct denied Brook substantive due process. The only Supreme Court opinion cited on the scope of substantive due process is *DeShaney*, 489 U.S. 189, which, as we have already seen, held that there was no due-process violation in that case and could hardly support, much less clearly establish, a violation by Defendant. The only opinion by another circuit cited by the estate on the matter is *Bowers v. DeVito*, 686 F.2d 616 (7th Cir. 1982), which affirmed summary judgment for defendant physicians accused of mistreating an institutionalized mental patient, likewise not an adequate source for clearly establishing law *favorable* to the estate. Also, we can disregard district-court decisions cited by the estate, which can be persuasive on the merits of a constitutional claim but cannot clearly establish what the law is. *See Woodward v. City of Worland*, 977 F.2d 1392, 1397 (10th Cir. 1992) ("[A] district court decision will not ordinarily 'clearly establish' the law even of its own circuit, much less that of other circuits." (internal quotation marks omitted)).

There remains only the estate's reliance on two published opinions by this circuit. One, *Hernandez v. Ridley*, 734 F.3d 1254 (10th Cir. 2013), comes five years too late to clearly establish the law in January 2008. *See Gross v. Pirtle*, 245 F.3d 1151, 1156 (10th Cir. 2001) (the plaintiff must "demonstrate that the right at issue was clearly established at the time of the defendant's unlawful conduct.").

The other Tenth Circuit opinion relied on by the estate is *Currier.* We discuss it in some detail. In *Currier* two young children were removed from their mother's home and

12

a court granted legal custody to the state Children, Youth and Families Department (CYFD). *See* 242 F.3d at 909. The court then gave the father physical, and later legal, custody, despite knowledge on the part of social workers that the father regularly failed to pay child support and was likely to be an inadequate caregiver. *See id*. During the father's custody of the children, social workers received repeated reports of abuse from the children's mother, but no steps were taken to end the father's custody. *See id.* at 909–10. Ultimately, one of the children died of burns after his father poured boiling water over him. *See id.* at 910. The plaintiffs brought claims against three social workers who had been assigned to the case; each asserted qualified immunity. *See id.* at 908.

We held that one social worker, Sentell, had not committed a constitutional violation because his failures occurred only after the children were in the father's legal custody. *See id.* at 920. Thus, he had not created any danger and he had "no constitutional duty to rescue the children," even assuming that he knew that other actors had created a danger to the children and he had "a clear opportunity to rescue [them]." *Id.* at 921. Our conclusion was informed by *DeShaney*'s observation that even if the state has once taken custody of a child, if it later returns him to the original custodian, "it place[s] him in no worse position than that in which he would have been had [the state] not acted at all." 489 U.S. at 201.

A second social worker, Doran, was sued because he was responsible for the state court's award of custody to the father and because of "various allegations as to [his] involvement after legal custody was awarded to [the father.]" *Currier*, 242 F.3d at 919.

13

We rejected qualified immunity for Doran with respect to his role in placing the children with the father because his assistance in their placement did create a danger to the children. *See id.* at 919–20. We distinguished *DeShaney* because the state had not returned the children to the same person (the children's mother) from whom it had taken custody. *See id.* at 918–19. But we held that "Plaintiff [could not] rely on Defendants' failure to intervene once custody was given to [the father]," and said that we would not consider Doran's postcustody conduct. *Id.* at 919.

The third social worker, Medina, also could not be liable for conducting an allegedly defective postcustody investigation. *See id.* at 921. But she allegedly told the children's mother "to stop making allegations of abuse because it was traumatizing the children." *Id.* We held that this statement could be a constitutional violation because it "cut[] off potential sources of state aid," namely the police or CYFD, who, alerted by the mother, might have acted to protect the child. *Id.* at 922.

The estate argues that this precedent clearly establishes that Defendant's behavior was a constitutional violation because she also cut off other sources of private aid. But Defendant's behavior is distinguishable. The first three purported affirmative actions that Defendant allegedly took—(1) refusing to accept the CD with pictures of abuse, (2) refusing to return police phone calls, and (3) refusing to substantiate abuse when investigating the large red mark on C.S.C.'s face—are all failures to act. These three refusals did not change the status quo. Like Sentell in *Currier*, Defendant did not place Brook with Mr. Coons and Ms. Wells, so she had no duty to rescue Brook from that

14

custody. The estate argues that this inaction amounted to action because it was motivated by ill-will. But *Currier* does not support this argument, and the estate cites no authority for the proposition that inaction can be treated as action because of the nonactor's ill-will.

The fourth and fifth purported affirmative actions—that Defendant told Mr. Crosetto to contact the police and that she said that any abuse of the children was not her issue—are likewise not clearly established constitutional violations under *Currier*. The statements amount to only Defendant's explanations for her refusal to act. The estate argues that at least Defendant's telling Mr. Crosetto to call the police was an affirmative act because it "removed safety valves and increased the vulnerability and danger to the children." Aplt. Br. 25–26. But unlike defendant Medina in *Currier*, Defendant did not tell the Crosettos not to report abuse—she affirmatively told them to go to the police. The estate has not provided any authority, and we would not expect to find any, for the proposition that telling someone to seek assistance from others deprived the person of assistance from others.

The estate's final purported affirmative action—that Defendant misrepresented to Mr. Crosetto that she had been inside Brook's home—is likewise not a clearly established constitutional violation. Nothing in *Currier*, where Medina affirmatively instructed the mother to stop reporting abuse, discusses misrepresentation. Perhaps *Currier* could be read as supporting the proposition that liability can be predicated on a misrepresentation that causes others to lower their guard and not seek protection by other means. But *Currier* did not clearly establish that proposition. Indeed, after *Currier* we rejected that

15

view of the law, relying on *DeShaney*. In *Gray v. University of Colorado Hospital Authority*, 672 F.3d 909 (10th Cir. 2012), a state hospital had told a man and his family that he would be constantly monitored while he was weaned from his antiseizure medicine, even though the hospital's protocol permitted leaving patients unattended and unobserved. *See id.* at 912. While unattended, the man died of a seizure. *See id.* The hospital admitted that the man would likely have survived if he had been constantly monitored. *See id.* We held that the hospital's "false assurances [did] not constitute an affirmative act rendering decedent vulnerable to danger within the meaning of the danger creation exception." *Id.* at 925. We relied on *DeShaney* as indicating that "assurances of protection from the State do not constitute affirmative conduct sufficient to invoke the state-created danger theory of constitutional liability." *Id.* Given *Gray*'s 2012 reading of the 1989 *DeShaney* opinion, it would be bizarre for us to say that the law in 2008 was clearly established to the contrary of the statement in *Gray*.

The estate attempts to distinguish *Gray* on the basis that there was no private violence in that case—the patient died as a result of his natural medical condition. It also argues that in *Gray* there was a promise about what would happen in the future, whereas here Defendant lied about what she had done in the past. But *Gray* relied on precedent— namely, *DeShaney*—involving private violence; and it certainly seems to say that a "false assurance[]," which we think is a proper way to characterize Defendant's alleged statement that she had visited the home, "do[es] not constitute an affirmative act." *Id.* at 925. In any event, the estate's burden is not merely to show that adverse case law might

16

be distinguishable.  The burden is to show that the law was *clearly* in its favor.  In our view, that burden has not been satisfied.

The estate has failed to show that Defendant's behavior was a clearly established violation of Brook's constitutional rights at the time it occurred.  Defendant is therefore entitled to qualified immunity.

## III.    CONCLUSION

We AFFIRM the judgment below.