BRISCOE, Circuit Judge,
concurring.
I agree that we are bound by odr prior ruling in Currier v. Doran, 242 F.3d 905 (10th Cir. 2001). However; I believe Currier was wrongly decided because it directly conflicts with the Supreme Court’s precedent in DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). In addition, to the extent the Court in DeShaney left the door open for an exception based on a state-created danger, the test the Tenth Circuit has devised for that exception has been applied too broadly. Our precedent should be reconsidered in an appropriate case.
I
In DeShaney, the Supreme Court held that social workers were not constitutionally liable for failing to protect Joshua DeShaney from his father, Randy DeShaney. DeShaney, 489 U.S. at 191, 109 S.Ct. 998. Authorities first learned that Joshua might be endangered when DeShaney’s second wife complained to police that DeShaney had hit. Joshua, causing marks. Id. at 192, 109 S.Ct. 998. “The Winnebago County Department of Social Services (DSS) interviewed [DeShaney], but he denied the accusations, and DSS did not pursue them further.” Id. A year later, Joshua was ad *1237 mitted to a local hospital with “multiple bruises and abrasions,” and the examining physician notified DSS of suspected child abuse. Id. DSS “immediately obtained an order from a Wisconsin juvenile court placing Joshua in the temporary custody of the hospital.” Id.
The county then convened a “‘Child Protection Team’ — consisting of a pediatrician, a psychologist, a police detective, the county’s lawyer, several DSS caseworkers, and various hospital personnel — to consider Joshua’s situation.” Id. The Team decided that “there was insufficient evidence of child abuse to retain Joshua in the custody of the court,” but did “recommend several measures, to protect Joshua, including enrolling him in a preschool program, providing his father with certain counseling services, and encouraging his father’s girlfriend to move out of the home.” Id. DeShaney promised to cooperate with these recommendations. Id. “Based on the recommendation of the Child Protection Team, the juvenile court dismissed the child protection case -and returned Joshua to the custody of his-father.” Id.
Following this incident, a DSS caseworker visited the DeShaney home monthly. “[S]he observed a number of suspicious injuries on Joshua’s head; she also noticed that he had not been enrolled in school, and that the girlfriend had not moved out.” Id. at 192-93, 109 S.Ct. 998. She recorded these observations, “along with her continuing suspicions that someone in the De-Shaney household was physically abusing Joshua.” Id. at 193, 109 S.Ct. 998. During this time, the case worker also received two more reports from emergency room personnel that Joshua had been treated for suspicious injuries. Id. at 192-93, 109 S.Ct. 998. The second of these reports was in November 1983. Id. at 193, 109 S.Ct. 998. On the caseworker’s next two monthly visits to the DeShaney home, she was told that Joshua was too ill to see her. Id. In March 1984, DeShaney beat Joshua.so severely that Joshua suffered permanent brain damage. Id, “DeShaney was subsequently tried and convicted of child abuse.” Id.
Joshua and his mother brought § 1983 claims against the County and' DSS employees alleging that the defendants “had deprived Joshua of his liberty without due process of law, in violation of his rights under the Fourteenth Amendment, by failing to intervéne to protect him against a risk of violence at his father’s hands of which they knew or should have known.” Id. at 193,109 S.Ct. 998. They claimed that a “special relationship” existed between Joshua and the State “because the State knew that Joshua faced a special danger of abuse at his father’s hands, and specifically proclaimed, by word and by deed, its intention to protect him against that danger.” Id. at 197, 109 S.Ct. 998 (quoting Brief for Petitioners at 13-20, DeShaney, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (No. 87-154), 1987 WL 880157). Specifically, as is most relevant here, the DeShaney plaintiffs asserted in their briefing that the county had violated Joshua’s due process rights because, inter alia, it “handed him back to his abusing father and the father’s abusing girlfriend.” Brief for Petitioners at 5 (emphasis added).
The Supreme Court began, by discussing the scope of substantive due process claims. “The Due Process Clause of the Fourteenth Amendment provides that ‘[n]o State shall ... deprive any person of life, liberty,, or property, without due process of law,’” DeShaney, 489 U.S. at 194, 109 S.Ct. 998. This Clause “does not transform every tort committed by a state actor into a constitutional violation.” Id. at 202, 109 S.Ct. 998. Rather, it “was intended to prevent government ‘from abusing [its] power, or employing it as an instrument of oppression.’ ” Id. at 196, 109 -S.Ct. 998 (quot *1238 ing Davidson v. Cannon, 474 U.S. 344, 348, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986)). It is “a limitation on the State’s power to act,” not “a guarantee of certain minimal levels of safety and security.” Id. at 195, 109 S.Ct. 998. In other words, “[i]ts purpose was to protect the people from the State, not to ensure that the State protected them from each other.” Id. at 196, 109 S.Ct. 998. “[T]he Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual.” Id. “[A] State’s failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause.” Id. at 197,109 S.Ct. 998.
The Court recognized that “in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals.” Id. at 198, 109 S.Ct. 998 (emphasis added). Specifically, “when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being.” Id. at 199-200, 109 S.Ct. 998. In such a case, “[t]he affirmative duty to protect arises not from the State’s knowledge of the individual’s predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.” Id. at 200, 109 S.Ct. 998. The conduct alleged in DeShaney did not meet this standard. Id. at 199-200 & 200,109 S.Ct. 998 n.9. The Court held that there was no special relationship between Joshua and the State, because the State had not “by the affirmative exercise of its power so restrain[ed] [Joshua’s] liberty that it rendered] him unable to care for himself.” Id. at 200, 109 S.Ct. 998. The Court stated further that the State’s assumption of temporary custody over Joshua did not change the analysis because “the State does-not become the permanent guarantor of an individual’s safety by having once offered him shelter.” Id. at 201, 109 S.Ct. 998.
In its analysis, the Court also stated that the State’s conduct, including returning Joshua to his father, did not create a danger to Joshua or increase his vulnerability to danger. Id. at 201, 109 S.Ct. 998. It wrote, “[w]hile the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them.” Id. (emphasis added). Again, the State’s temporary assumption of custody of Joshua did not alter this analysis because returning Joshua to his father’s custody “placed him in no worse position than that in which he would have been had [the State] not acted at all.” Id. Thus, the Court’s opinion in DeShaney addressed both the special relationship exception and the state created danger exception and concluded that neither created an affirmative constitutional duty on the part of the state to protect Joshua. Id Because “the State had no constitutional duty to protect Joshua against his father’s violence, its failure to do so — though calamitous in hindsight — simply d[id] not constitute a violation of the Due Process Clause.” Id at 202,109 S.Ct. 998.
Despite this clear statement in DeShaney, we held in Currier that social workers are constitutionally liable for harms inflicted upon children if the social worker was “responsible for” the court’s decision to authorize the custody' arrangement in which the child was later harmed. Currier, 242 F.3d at 919-20. We attempted to avoid the controlling precedent in DeShaney by drawing a distinction that returning a child to the same parent did not increase the child’s vulnerability to danger from violence at the hands of that parent, but *1239 returning a child to a different parent did. Id. at 918.
The plaintiffs in Currier, as representatives of the children Latasha and Anthony, brought § 1983 claims against, among others, Tom Doran, a social worker for the Children, Youth, and Families Department of the State of New Mexico (CYF), alleging that Doran had “violated their fundamental rights under the Fourteenth Amendment of the United States Constitution.” Id. at 908. The facts relevant to the issue in DeShaney, presented in the light most favorable to the Currier plaintiffs, are as follows.
On April 30, 1993, CYF investigated a report of neglect regarding Latasha and Anthony, who were, at the time, in the custody of their mother, Devonne Juarez. Id. at 909. A CYF worker found Latasha and Anthony, both under the age of four at the time, in the care of their five-year-old cousin. Id. Juarez had left the state. Id.
CYF petitioned the Children’s Court for an order formally transferring legal custody of Latasha and Anthony to CYF. Id. A hearing regarding this petition was held on May 10,1993. Id. As of this hearing, Doran had learned that the children’s father, Vargas, had a “history of financial irresponsibility” and had made only eight child support payments in the previous three years. Id. Doran attended the Children’s Court hearing, but did not say anything about Vargas’s failure to pay child support. Id. The Children’s Court granted legal custody of the children to CYF, but physical custody to Vargas. Id.
On July 22,1993, Doran visited Vargas’s home and noticed a small bruise on Anthony’s cheek, which Vargas’s girlfriend attributed to a fall on the playground. Id. On August 3, 1993, Anthony had another bruise when he arrived at CYF for an office visit. Id This bruise was also attributed to a fall. Id. Juarez reported in both August and September that Vargas was physically abusing the children. Id. Doran was aware of at least one of these reports but did not investigate. Id. Also in August 1993, Juarez alleged that Vargas’s fiancée punished the children by dunking them in a bathtub full of water. Id. Again, Doran was aware of this allegation but did not investigate. Id. On October 15, 1993, the children came to CYF for an office visit. Latasha had two visible bruises on her back. When asked who gave them to her, she replied “Da Da.” Id. at 910.
On October 19, 1993, legal custody was transferred to Vargas. Id. at 909. On April 16, 1994, Vargas poured boiling water on Anthony. Id. Anthony later died from his injuries. Id. This court affirmed the denial of qualified immunity to Doran under a state-created danger theory. Id. at 919.
II
As a factual matter, I cannot square Currier with DeShaney. I am not persuaded by our purported distinction between a state that assumes custody of a child from a parent and then returns that child to the same parent and a state that assumes custody of a child and then returns that child to a different parent. In both cases the state makes an affirmative recommendation regarding the placement of the child. And, in DeShaney, this purportedly affirmative conduct was not adequate to implicate substantive due process concerns. DeShaney, 489 U.S. at 201, 109 S.Ct. 998. Therefore, assuming arguendo that the state-created danger theory of substantive due process violations is a valid theory of liability in some circumstances, then either the conduct alleged in Currier does not meet the Tenth Circuit’s test, or that test sets the bar too low.
Under our test, to establish a claim under the danger-creation theory, a plaintiff must show: (1) “that the state actor engaged in affirmative conduct”; (2) “that there was private violence”; (3) that the *1240 state actor “created the danger or increased plaintiffs vulnerability to the danger in some way”; (4) that “plaintiff was a member of a limited and specifically definable group”; (5) that the state actor’s “conduct put plaintiff at substantial risk of serious, immediate, and proximate harm”; (6) that “the risk was obvious or known”; (7) that the state actor “acted recklessly in conscious disregard of that risk”; and (8) that “such conduct, when viewed in total, is conscience shocking.”[1] Estate of B.I.C. v. Gillen, 761 F.3d 1099, 1105 (10th Cir. 2014) (quoting Estate of B.I.C. v. Gillen, 710 F.3d 1168, 1173 (10th Cir. 2013)), Although I doubt that Doran’s conduct meets several of these elements, I focus here on the first, affirmative conduct.
With respect to this element, we held in Currier that Doran “was responsible for the Children’s Court’s decision to grant Vargas legal custody, through either his failure to investigate and, report to the court or through his affirmative recommendation.” Currier, 242 F.3d at 919 (emphasis added). The factual basis for this conclusion was that Doran failed to tell the Children’s Court about Vargas’s history of financial irresponsibility, failed to further investigate bruises after Vargas and his fiancée offered an explanation, and failed to investigate Juarez’s allegation that Vargas’s fiancée had punished the children by dunking them in a bathtub full of water. Id. Notably, these are all omission's, not affirmative acts. We then stated that “Do-ran ‘created the danger or increased the plaintiff[s’] vulnerability to the danger’ through his failure to investigate the numerous bruises and allegations of abuse and his responsibility for the court order granting legal custody to Vargas.” Id.- at 919-20 (emphasis added). In a footnote, we elaborated:
It is true that the conduct Plaintiffs complain of is partially a failure by Do-ran to act,on particular allegations of abuse. Doran’s failure-to investigate allegations of abuse while the children were in state legal custody should be distin- . guished, however, from a claim that the state failed to rescue the children .once legal custody was given to Vargas. Do-ran’s failure to investigate allegations of abuse should be viewed in the general context of the state’s affirmative conduct -in removing the children from their mother and placing the children with their father.
Id. at 920 n.7.
As a general matter, I find it hard to conclude that a social worker can be “responsible for” the independent decision of a judge who ultimately orders a change of custody. But, .even if we,assume such responsibility exists, we cannot transform omissions or failures to act into affirmative conduct merely by considering them “in the general context of’ a custody recommendation. The only affirmative act that could be found in Currier is the recommendation itself, which, in my view is no different from the affirmative recommendation in DeShaney that Joshua be returned to his father’s custody. - .
If constitutional liability attaches to such a recommendation, any future harm that befalls a child in the recommended placement could be the basis for a substantive due process claim against- the social worker. This rule makes the state the perma *1241 nent guarantor' of a child’s safety. The Supreme Court has told us that substantive due process does not reach so far. DeShaney, 489 U.S. at 201, 109 S.Ct. 998. Either a custody recommendation is not the type of affirmative conduct that can support a substantive due process violation under our test for a state-created danger theory of liability, in which case Currier was wrongly decided on the facts; or our test for the state-created danger theory conflicts with the Supreme Court’s decision in DeShaney, by imposing liability for acts that do not violate the Due Process Clause of the Constitution.

. We have referred to these first two elements as "preconditions” that must be met before a plaintiff may allege a substantive due process claim' premised on a theory of state-created danger. Estate of B.I.C. v. Gillen, 761 F.3d 1099, 1105 (10th Cir. 2014); Gray v. Univ. of Colo. Hosp. Auth., 672 F.3d 909, 920 n.8 (10th .Cir. 2012) (recognizing that the omission of these two preconditions from the six-factor test had "generate[d] oversight on the part of courts and counsel alike,” because these preconditions are necessary to invoke the state-created danger theory).